## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

_____

SONYA KENETTE BROWN,

                  *Plaintiff*,                   **COMPLAINT and JURY DEMAND**

v                                  Case No.:

                                  Hon.

CITY OF ALBION,
ALBERT SMITH, individually and in his official capacity as City Council Member for the City of Albion, GLENIANE REID, individually and in her official capacity as City Council Member for the City of Albion, SHANE WILLIAMSON, individually and in his official capacity as City Council Member for the City of Albion, DAVID ATCHISON, individually and in his official capacity as the Mayor of the City of Albion, SCOTT KIPP, individually and in his official capacity as Chief of Public Safety for the City of Albion, JASON KERN, individually and in his official capacity as the Deputy Chief of Public Safety for the City of Albion, CULLEN HARKNESS, individually and in his official capacity as City Attorney for the City of Albion, NICOLE WYGANT, individually and in her official capacity as Detective/Sergeant for the City of Albion Department of Public Safety, and BRUCE NELSON, in his individual capacity,

                  *Defendants*,

_____

Eric J. Sheppard, P71914
Attorney for Plaintiff
2109 Hamilton Road, Suite 206
Okemos MI 48864
Ph: 517-618-1580
Fx: 517-913-6321
ericsheppard16@gmail.com

_____

      NOW COMES, the Plaintiff, Sonya Kenette Brown, by and through her attorney, Eric J. Sheppard, and for her Complaint against the above-named Defendants and their employees, agents, and successors in office, states as follows:

## INTRODUCTION

1.      This is a case involving violations of the First Amendment, Fourteenth Amendment, and Fourth Amendment – where Defendants engaged in an unlawful search, conspired to retaliate against Plaintiff, and violated Plaintiff's clearly established First Amendment and Fourth Amendment rights – after Plaintiff engaged in protected political speech involving a matter of public concern that was made in Plaintiff's capacity as a private citizen.

2.      This case also involves an unconstitutional city charter provision, which was weaponized to maliciously prosecute Plaintiff, without probable cause, in retaliation for Plaintiff's protected political speech, and in violation of Plaintiff's clearly established First Amendment and Fourth Amendment rights.

3.      Finally, this case involves a municipal policy or custom of Defendants through the unconstitutional city charter provision, and Defendants' deliberate conduct, which was the moving force that caused Plaintiff to be subjected to the deprivation of Plaintiff's clearly established First Amendment and Fourth Amendment rights. *Kentucky v Graham*, 473 US 159 (1985); *Bd of Cty Comm'rs of Bryan Cty, Okl v Brown*, 520 US 397 (1997); *City of St Louis v Praprotnik*, 485 US 112 (1988).

4.      Defendants are not entitled to qualified immunity for their conduct that violated Plaintiff's clearly established First Amendment and Fourth Amendment rights.

5.      And political subdivisions of the state have no Eleventh Amendment protection from suit in federal court. *Moor v County of Alameda*, 411 US 693 (1973); *Northern Ins Co of New York v Chatham County, Ga*, 126 S Ct 1689 (2006).

6.      This case is brought under 42 USC § 1983, which provides that: Every person who, under color of any statute, ordinance, regulation, custom or usage, of any State…subjects, or causes to be subjected, any citizen of the United States…to the deprivation of any rights, privileges, or immunities secured by the Constitution…shall be liable to the party injured in an action at law.

7.      Section 1983 is not itself a source of substantive rights; rather, it provides a procedural vehicle for vindicating rights conferred by the United States Constitution or federal statute. *Albright v Oliver*, 510 US 266 (1994).

8.      A municipality or other local government body is a "person" under 42 USC § 1983, which may be held liable if the plaintiff can identify a municipal policy or custom that caused the plaintiff's injury. *Bd of the County Comm's of Bryan County v Brown*, 520 US 397 (1997).

9.      The plaintiff must identify a constitutional injury, a policy attributable to the municipality or other local government body, and a causal relationship between that policy and the claimed injury. *City of Los Angeles v Heller*, 475 US 796 (1986).

10.     And a "policy" includes a "policy statement, ordinance, regulation, or decision officially adopted and promulgated" by the government entity. *Monell v Dep't of Soc Servs*, 436 US 658 (1978).

**First Amendment and Fourteenth Amendment**

**General Principles**

11.     This case involves protected free speech under the **First Amendment**.

12.     The First Amendment to the United States Constitution provides that "Congress shall make no law…abridging the freedom of speech." US Const, Am I.

13.     The First Amendment applies to government action in the State of Michigan through the **Fourteenth Amendment**. *NAACP v Claiborne Hardware Co*, 458 US 886 (1982).

14.     The First Amendment applies to municipal governments. ["a government, including a municipal government vested with state authority, 'has no power to restrict expression because of its message, its ideas, its subject matter or its content.'" *Reed v Town of Gilbert, Arizona*, 135 S Ct 2218 (2015) (quoting *Police Dep't of Chicago v Mosley*, 408 US 92 (1972).

15.     The First Amendment demands that courts "give the benefit of the doubt to speech, not censorship." *Federal Election Comm'n v Wisconsin Right to Life, Inc*, 551 US 449 (2007).

16.     "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable." *Texas v Johnson*, 491 US 397; 109 S Ct 2533 (1989).

17.     "The hallmark of the protection of free speech is to allow 'free trade in ideas' – even ideas that the overwhelming majority of people might find distasteful or discomforting." *Virginia v Black*, 538 US 343; 123 US 1536 (2003).

18.     "Speech may not be banned on the ground that it expresses ideas that offend." *Matal v Tam*, 582 US __; 137 S Ct 1744 (2017).

19.     And "speech cannot be restricted simply because it is upsetting or arouses contempt." *Snyder v. Phelps*, 562 US 443 (2011).

20.    "Speech is often provocative and challenging…[But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.'" *City of Houston, Tex. v Hill*, 482 US 451, 461; 107 S Ct 2502; 96 LEd2d 398 (1987) citing *Terminiello v Chicago*, 337 US 1, 4; 69 S Ct 894; 93 LEd 1131 (1949); *Leonard v Robinson*, 477 F3d 347 (ED Mich., 2007).

21.    "The government may not regulate [speech] based on hostility—or favoritism— towards the underlying message expressed." *RAV v City of Saint Paul, Minnesota*, 505 US 377, 386; 112 S Ct 2538; 120 L Ed 2d 305 (1992).

22.    The government may not engage in a particular invidious kind of content discrimination known as viewpoint discrimination. *Rosenberger v Rector & Visitors of Univ of Va*, 515 US 819 (1995); *Am Freedom Def Initiative v Suburban Movility Auth for Reg'l Transp*, 978 F3d 481 (6th Cir 2020).

23.    "The First Amendment permits restrictions upon the content of speech in a few limited areas, which are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality." *Black*, 538 US at 358- 359.

24.    The First Amendment applies to spoken words as well as electronic communications. *Id*.; *Packingham v North Carolina*, 137 S Ct 1730 (2017).

25.    And a State cannot punish citizens for engaging in constitutionally protected speech. *Wright v State of Georgia*, 373 US 284 (1963); *Johnson v State of Virginia*, 373 US 61 (1963); *Cox v State of Louisiana*, 379 US 536 (1965); *Brown v State of Louisiana*, 383 US 131 (1966); *Shuttlesworth v City of Birmingham*, 394 US 147 (1969).

**Political Speech**

26.     The First Amendment is an important part of our system of self-government. It specifically allows for the people "to petition the government for a redress of grievances." US Const, Am I. *Near v Minnesota*, 283 US 697 (1931).

27.     And political speech is "at the core of what the First Amendment is designed to protect." *Virginia v Black*, 538 US 343 (2003).

28.     Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This, of course, includes discussions of the candidates, structures, and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. *Mills v Alabama*, 384 US 214 (1966); *Stromberg v California*, 283 US 359 (1931) ("The maintenance of the opportunity for free political discussion to the end that government may be responsive to the will of the people and that changes may be obtained by lawful means, an opportunity essential to the security of the Republic, is a fundamental principle of our constitutional system").

29.     The First Amendment reflects "a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." *NY Times Co v Sullivan*, 376 US 254 (1964) (citing *Terminiello v Chicago*, 337 US 1 (1949) and *De Jonge v Oregon*, 299 US 353 (1937).

30.     Courts have recognized that the First Amendment "protects a significant amount of verbal criticism and challenge directed at police officers. 'Speech is often provocative

and challenging…[But it] is nevertheless protected against censorship or punishment, unless shown likely to produce a clear and present danger of a serious substantive evil that rises far above public inconvenience, annoyance or unrest.'" *City of Houston, Tex. v Hill*, 482 US 451, 461; 107 S Ct 2502; 96 LEd2d 398 (1987) citing *Terminiello v Chicago*, 337 US 1, 4; 69 S Ct 894; 93 LEd 1131 (1949).

31.     "One of the prerogatives of American citizenship is the right to criticize public men and measures." *Baumgartner v. United States*, 322 U.S. 665, 673–674 (1944). See also *Cohen v. California*, 403 U.S. 15, 18 (1973); *West Virginia State Bd. of Ed. v. Barnette*, 319 U.S. 624, 638 (1943).

32.     In line with that concept, the United State Supreme Court has "repeatedly invalidated laws that provide the police with unfettered discretion to arrest individuals for words or conduct that annoy or offend them." *Hill*, 482 U.S. at 465; *Id*. at 465 n.15 (listing examples).

33.     *Hill* rejected the enforcement of a Houston law prohibiting speech that "interrupt[s]" police. 482 U.S. at 462–463. To the contrary, "[t]he freedom of individuals * * * to oppose or challenge police action without thereby risking arrest is one of the principal characteristics by which we distinguish a free nation from a police state." [See also *Nieves v Bartlett*, 139 SCt 1715 (2019) (Gorsuch, J., concurring in part) ("If the state could use these laws not for their intended purposes but to silence those who voice unpopular ideas, little would be left of our First Amendment liberties, and little would separate us from the tyrannies of the past or the malignant fiefdoms of our own age.") *Id*. at 1736.

**Qualified Immunity, the First Amendment, and Probable Cause to Arrest**

34.     Under the doctrine of qualified immunity, "government officials performing
discretionary functions generally are shielded from liability for civil damages insofar as
their conduct does not violate clearly established statutory or constitutional rights of
which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818
(1982).

35.     "Thus, a defendant is entitled to qualified immunity on summary judgment unless
the facts, when viewed in the light most favorable to the plaintiff, would permit a
reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the
right was clearly established." *Bishop v. Hackel*, 636 F.3d 757, 765 (6th Cir. 2011) (citing
*Pearson v. Callahan*, 555 U.S. 223, 232 (2009)); see also *Moderwell v. Cuyahoga
County*, 997 F.3d 653, 659–660 (6th Cir. 2021); *District of Columbia v. Wesby*, 138 S.
Ct. 577, 589 (2018) (cleaned up).

36.     "Once raised, the plaintiff bears the burden of showing that a defendant is not
entitled to qualified immunity." *Bletz v. Gribble*, 641 F.3d 743, 750 (6th Cir. 2011)
(citing *Ciminillo v. Streicher*, 434 F.3d 461, 466 (6th Cir. 2006)); *Rivas- Villegas v.
Cortesluna*, 142 S. Ct. 4, 8 (2021) (per curiam); *Cunningham v. Shelby County*, 994 F.3d
761, 764–65 (6th Cir. 2021).

37.     On summary judgment, a court views the factual evidence and draws all
reasonable inferences in favor of the non-moving party; but when a defendant raises the
defense of qualified immunity in a motion for summary judgment, the plaintiff must
show that those facts and inferences would allow a reasonable juror to conclude that the

defendant violated a clearly established constitutional right. *Barton v. Martin*, 949 F.3d 938, 947 (6th Cir. 2020).

38.     A government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011) (cleaned up); *Anderson v Creighton*, 483 US 635 (1987) ["The central concept is that of "fair warning." *Kinney v Weaver*, 367 F3d 337 (5th Cir 2004) (en banc) (quoting *Hope v Pelzer*, 536 US 730 (2002)].

39.     "To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent." *Wesby*, 138 S. Ct. 577, 589 (2018).

40.     There does not need to be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft*, 563 U.S. at 741 (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).

41.     "The 'clearly established' standard also requires that the legal principle clearly prohibit the officer's conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590.

42.     The Supreme Court has "repeatedly stressed that courts must not 'define clearly established law at a high level of generality, since doing so avoids the crucial question whether the official acted reasonably in the particular circumstances that he or she faced.'" *Id.* (quoting *Plumhoff v. Rickard*, 572 U.S. 765, 779 (2014)).

43.     "A rule is too general if the unlawfulness of the officer's conduct 'does not follow immediately from the conclusion that [the rule] was firmly established.'" *Id.* (quoting *Anderson*, 483 U.S. at 641).

44. But "there can be the rare 'obvious case,' where the unlawfulness of the officer's conduct is sufficiently clear even though existing precedent does not address similar circumstances." *Id*. (quoting *Brosseau v. Haugen*, 543 U.S. 194, 199 (2004)); see also *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

45. "Thus, when 'no reasonable . . . officer could have concluded' that the challenged action was constitutional, the Supreme Court has held that there does not need to be a case directly on point." *Moderwell*, 997 F.3d at 660 (quoting *Taylor v. Riojas*, 141 S. Ct. 52, 53 (2020)); see also *McCoy v. Alamu*, 141 S. Ct. 1364 (2021).

46. To defeat qualified immunity, a plaintiff must show that government officials violated the plaintiff's First Amendment rights and that their actions were objectively unreasonable in light of clearly established law. *Powers v Northside Indep Sch Dist*, 951 F3d 298 (5th Cir 2020).

47. And "officials can still be on notice that their conduct violates established law even in novel factual circumstances." *Hope*, 536 US at 741 ["[A] general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though the very action in question has [not] previously been held unlawful." (quoting *Anderson*, 483 US at 640)].

48. The doctrine of qualified immunity does not always require the plaintiff to cite binding case law involving identical facts.

49. An official who commits a patently "obvious" violation of the Constitution is not entitled to qualified immunity. *Hope*, 536 US at 745.

50. There is no recognized right to be free from a retaliatory arrest that is supported by probable cause. *Reichle v. Howards*, 566 U.S. 658, 663 (2012).

51.     But in order for an arrest to survive constitutional scrutiny, the government officials must have had probable cause to believe that the person arrested committed the offense charged. *Hunter v Bryant*, 502 US 224; 112 SCt 534 (1991).

52.     For probable cause to exist, "the facts and circumstances known to the officer" must be sufficient to lead a "prudent man" to believe an offense has been committed. *Logsdon v. Hains*, 492 F.3d 334, 341 (6th Cir. 2007) (citation omitted).

53.     Probable cause is an issue of fact for the jury to resolve if there are any genuine issues of material fact that are relevant to the inquiry. *St John v Hickey*, 411 F3d 762 (6th Cir 2005).

54.     Further, "protected speech cannot serve as the basis" for probable cause. *Leonard v. Robinson*, 477 F.3d 347, 358 (6th Cir. 2007) (citing *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997)) [an officer may not base his or her probable cause determination on speech protected by the First Amendment].

55.     While protected speech can be evidence that a speaker committed a separate crime, the First Amendment bars its use as the sole basis for probable cause. See *Reichle*, 566 U.S. at 668; see also *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 1724 (2019); *Novak v City of Parma*, 932 F.3d at 431–32.

56.     And if the freedom of speech secured by the First Amendment includes the right to curse at a public official, then it surely includes the right to say "[get] rid of" a public official. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942) ("'You are a God damned racketeer' and 'a damned Fascist'"); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th Cir. 1997) ("In 1990 when [the defendant] was arrested for his use of the 'f - word,' it was clearly established that speech is entitled to First Amendment protection."); *Buffkins*

*v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990) ("I will have a nice day, asshole.")

[*Smith ex rel Smith v Mt Pleasant Public Schools*, 285 F Supp 2d 987 (ED Mich 2003) –

finding a state law that permitted school discipline for "verbal assault" unconstitutional

("However, the policy's language also would allow curtailment of speech that questions

the wisdom or judgment of school administrators and their policies, or challenges the

viewpoints of students in strong or even insulting terms. For instance, student

commentary questioning the competence of a teacher, or ***advocating that a school***

***district employee should be fired***, or criticizing a fellow student as morally bereft, or

complaining that a coach gives more playing time to an inferior athlete because of

personal favoritism, all can be found to threaten the dignity or well-being of the targets of

the criticism, who undoubtedly would take offense at the comments. As the Third Circuit

notes, however, "[t]he Supreme Court has held time and again, both within and outside of

the school context, that the mere fact that someone might take offense at the content of

speech is not sufficient justification for prohibiting it." *Saxe v State College Area School*

*District*, 240 F3d 200 (3d Cir 2001)] (emphasis added).

57.     The focus must be on the facts within the government's knowledge at the moment

of the arrest or charge [the probable cause inquiry focuses on facts within the arresting

officer's knowledge at the time of the arrest; *Hunter v Bryant*, 502 US 224; 112 SCt 534

(1991).

58.     And a trial court is required to consider the facts in the light most favorable to the

plaintiff for a summary judgment motion. *Champion v Outlook Nashville, Inc*, 380 F3d

893 (6th Cir 2004).

**Public Employee and Speech as a Matter of Public Concern**

59.     Public employees do not surrender all of their First Amendment rights by reason of their employment. *Garcetti v Ceballos*, 126 S Ct 1951 (2006).

60.     Rather, the First Amendment protects a public employee's right, in certain circumstances, to speak as a private citizen addressing matters of public concern. *Pickering v Board of Ed of Township High School Dist 205, Will Cty*, 391 US 563 (1968); *Connick*, *supra*, at 147; *Rankin v. McPherson*, 483 U. S. 378, 384 (1987); *United States v. Treasury Employees*, 513 U. S. 454, 466 (1995).

[*Pickering* and the cases decided in its wake identify two inquiries to guide interpretation of the constitutional protections accorded to public employee speech. The first requires determining whether the employee spoke as a citizen on a matter of public concern. *Id*. at 568. If the answer is no, the employee has no First Amendment cause of action based on his or her employer's reaction to the speech. See *Connick*, *supra*, at 147. If the answer is yes, then the possibility of a First Amendment claim arises. The question becomes whether the relevant government entity had an adequate justification for treating the employee differently from any other member of the general public. See *Pickering*, 391 U. S., at 568. This consideration reflects the importance of the relationship between the speaker's expressions and employment. A government entity has broader discretion to restrict speech when it acts in its role as employer, but the restrictions it imposes must be directed at speech that has some potential to affect the entity's operations].

61.     The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict, incidentally or intentionally, the liberties employees

enjoy in their capacities as private citizens. See *Perry v. Sinder- mann*, 408 U. S. 593, 597 (1972).

62.     So long as employees are speaking as citizens about matters of public concern, they must face only those speech restrictions that are necessary for their employers to operate efficiently and effectively. See, e.g., *Connick*, *supra*, at 147 (Our responsibility is to ensure that citizens are not deprived of fundamental rights by virtue of working for the government).

63.     The First Amendment protects some expressions related to the speaker's job. *Givhan v. Western Line Consol School Dist,*, 439 U. S. 410, 414 (1979). [As the Court noted in *Pickering*: Teachers are, as a class, the members of a community most likely to have informed and definite opinions as to how funds allotted to the operation of the schools should be spent. Accordingly, it is essential that they be able to speak out freely on such questions without fear of retaliatory dismissal. 391 U. S., at 572. The same is true of many other categories of public employees.]

64.     Employees who make public statements outside the course of performing their official duties retain some possibility of First Amendment protection because that is the kind of activity engaged in by citizens who do not work for the government. The same goes for writing a letter to a local newspaper, see *Pickering*, 391 U. S. 563, or discussing politics with a co-worker, see *Rankin*, 483 U. S. 378.

65.     Speech involves a matter of public concern when it can be "fairly considered as relating to any matter of political, social, or other concern to the community." *Connick v Myers*, 461 US 138 (1983) ["subject of general interest and of value and concern to the public." *City of San Diego v Roe*, 543 U.S. 77, 84 (2004) (per curiam)].

66.     To resolve the public/private distinction, we look to the "content, form, and context of a given statement, as revealed by the whole record." *Mosholder v Barnhardt*, 679 F.3d 443, 449–50 (6th Cir. 2012) (quoting *Connick*, 461 U.S. at 147–48).

67.     And in undertaking that analysis, we set aside the shocking and no doubt painful aspects of any comments that are made. For whether speech is shocking or inappropriate is irrelevant to whether it concerns a public matter. *Rankin v McPherson*, 483 U.S. 378, 387 (1987).

68.     The First Amendment is not so fragile that its guarantees rise or fall with the pronouns a speaker selects.

69.     And expressions of opinion, even distasteful ones, do not become matters of personal interest simply because they are phrased in the first person or reflect a personal desire. See, e.g., *Rankin*, 483 U.S. at 381 (holding that an employee's statement to a co-worker that, "if they go for him again, I hope they get him," in reference to the assassination attempt on President Reagan, was speech on a matter of public concern) [Instead of commenting on a personal grievance, the poster remarked on a "subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (describing a "subject of legitimate news interest"); see also *Roe*, 543 U.S. at 84. Said differently, the posts addressed a "subject" one could envision "stepping up to the microphone" to discuss in the traditional public square. See *Dambrot v. Central Mich. Univ.*, 55 F.3d 1177, 1188 (6th Cir. 1995) (quoting *Dambrot v. Central Mich. Univ.*, 839 F. Supp. 477, 487 (E.D. Mich. 1993))].

70.     Further, the "public concern/private interest analysis does not require that a communication be utterly bereft of private observations or even expressions of private

15

interest." *Mosholder*, 679 F.3d at 450–51 (citing *Perry v. McGinnis*, 209 F.3d 597, 609

(6th Cir. 2000)); see also *Westmoreland v. Sutherland*, 662 F.3d 714, 719 (6th Cir. 2011)

(holding that it is not "necessary for the entire expression to address matters of public

concern, as long as some portion of the speech does" (citation omitted)). Rather, the

relevant question is whether the communication "touches 'upon matters only of personal

interest.'" *Mosholder*, 679 F.3d at 450 (quoting *Connick*, 461 U.S. at 147).

71.     Moreover, speech need not be communicated to the general public to be on a

matter of public concern. See *Handy-Clay*, 695 F.3d at 544. [Keep in mind that the very

genesis behind Facebook and other social media platforms is to allow one the opportunity

to share messages and opinions with a wide audience. That reality, in fact, has made

social media perhaps the primary venue for exchanging ideas on public issues. See

*Packingham v. North Carolina*, 137 S. Ct. 1730, 1732 (2017) (referring to social media

as "the modern public square").

72.     Whether one's public expression comes from the ink of a quill pen, the stroke of a

keyboard, or the tapping of an iPhone, that expression is entitled to First Amendment

protection under the same strictures. See *Id*. at 1735–36.

**Fourth Amendment**

### General Principles

73.     This case also involves the **Fourth Amendment**.

74.     This case involves an unlawful search of an electronic device and the social media

messenger accounts of City of Albion government officials, which implicates the Fourth

Amendment of the United States Constitution.

75.     The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures." US Const, Amend IV; *United States v Jones*, 565 US 400 (2012).

76.     "The Fourteenth Amendment, as now applied to the States, protects the citizen against the State itself and all of its creatures." *West Virginia State Bd of Educ v Barnette*, 319 US 624 (1943).

77.     Government officials are state actors for purposes of the Fourth Amendment and are subject to the constitutional prohibition on unreasonable searches and seizures. *New Jersey v TLO*, 469 US 325 (1985); *Andrews v Hickman County, Tennessee*, 700 F3d 845 (6th Cir 2012) [Fourth Amendment's restrictions on unreasonable searches extended to the "activities of civil as well as criminal authorities." citing *New Jersey v TLO*; *Id*.].

78.     And the Fourth Amendment applies when the government acts in its capacity as an employer. *Treasury Employees v Von Raab*, 489 US 656 (1989).

79.     Further, individuals do not lose their Fourth Amendment rights merely because they work for the government instead of a private employer. *O'Connor v Ortega*, 480 US 709 (1987) ["non-investigatory, work-related purpose[e]" or for the "investigation[n] of work-related misconduct"].

80.     A Fourth Amendment search "occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kyllo v United States*, 533 US 27 (2001); *California v Ciraolo*, 47 US 207 (1986); *Florida v Riley*, 488 US 445 (1989) [upholding search where governmental officials, lawfully in a public place, do not conduct unlawful searches, by observing things in plain view] [The Fourth Amendment protects certain expectations of privacy. *Katz v United States*, 389 US 347 (1967)].

81.     "As a general matter, 'warrantless searches are presumptively unreasonable,'
*Horton v. California*, 496 U.S. 128, 133 (1990)..." *Braam v. Carr*, 20-1059 (7th Cir June
21, 2022).

82.     "The Fourth Amendment prohibits only unreasonable searches. The
reasonableness of a search depends on the totality of the circumstances, including the
nature and purpose of the search and the extent to which the search intrudes upon
reasonable privacy expectations." *Id.* at 310.

83.     Assessing reasonableness under the totality of the circumstances requires "a
balancing of individual privacy interests and legitimate state interests to determine the
reasonableness of the category of warrantless search that is at issue." *Birchfield v. North
Dakota*, 136 S.Ct. 2160, 2185 n.8 (2016); see also *Wyoming v. Houghton*, 526 U.S. 295,
299-300 (1999).

**Fourth Amendment Standing**

84.     Because the Fourth Amendment protects "[t]he right of the people to be secure in
their persons, houses, papers, and effects, against unreasonable searches and seizures,"
U.S. Const. amend. IV (emphasis added), Fourth Amendment rights are said to be
"personal." *Rakas v. Illinois*, 439 U.S. 128, 133 (1978) (citation omitted).

85.     So a defendant must show that "his own" rights were "infringed." *Byrd v. United
States*, 138 S. Ct. 1518, 1526 (2018) (quoting *Rakas*, 439 U.S. at 133).

86.     Courts use "standing" as a "shorthand" for this requirement. *Id.* at 1530.

87.     And a defendant has standing only if he has a Fourth Amendment interest in the
property searched. *Byrd*, 138 S. Ct. at 1530.

88.     This interest can either be a property or a privacy interest. *Id.* at 1526.

89.     When an individual "seeks to preserve something as private," and his or her

expectation of privacy is "one that society is prepared to recognize as reasonable," then

official intrusion into that sphere ***generally*** qualifies as a search and ***requires*** a warrant

supported by probable cause. *Smith v Maryland*, 442 US 735 (1979). (emphasis added).

90.     "In *City of Ontario v. Quon,* 560 U.S. 746, 130 S. Ct. 2619, 177 L. Ed. 2d 216

(2010), the United States Supreme Court assumed, without deciding, that citizens do have

a reasonable expectation of privacy in their text messages, but upheld a police

department's review of an officer's text messages as reasonable under the Fourth

Amendment." *State v Hinton*, 179 Wash 2d 862 (2014); [see also *People v Katzman*, 330

Mich App 128 (2019) (distinguishing *Hinton* because there was a lawful search warrant

in *Katzman*).

91.     "Several lower courts have held that people have an expectation of privacy under

the Fourth Amendment in the content stored on their cell phones, including text

messages. *See United States v. Zavala,* 541 F.3d 562, 577 (5th Cir. 2008); *United States

v. Finley,* 477 F.3d 250, 259 (5th Cir. 2007); *United States v. Davis,* 787 F. Supp. 2d

1165, 1170 (D. Or. 2011); *United States v. Quintana,* 594 F. Supp. 2d 1291, 1299 (M.D.

Fla. 2009). Other courts have found a privacy interest in text messages stored by a service

provider. *See Missouri v. Clampitt,* 364 S.W.3d 605, 611 (Mo. Ct. App. 2012); *State v.

Bone,* 12-34 (La. App. 5 Cir. 09/11/12); 107 So. 3d 49,63-67. Fewer courts have

addressed the privacy interests of a sender when police access a sender's text messages on

a recipient's device. *Compare State v. Patino,* No. P1-10-1155A, slip op. (R.I. Super. Ct.

Sept. 4, 2012) (finding sender had reasonable expectation of privacy in sent text

messages accessed by police during search of recipient's cell phone), *with Fetsch v. City*

*of Roseburg*, 2012 WL 6742665 (D. Or. Dec. 31, 2012) (finding sender had no reasonable expectation of privacy in text messages once sent to a third party)." *Hinton*, *supra*.

**Probable Cause to Arrest**

92.     "Probable cause exists when all of the facts known by a police officer 'are sufficient for a reasonable person to conclude that the suspect had committed, or was in the process of committing, an offense.'" *Texas v. Kleinert*, 855 F.3d 305, 316 (5th Cir. 2017) (quoting *United States v. Castro*, 166 F.3d 728, 733 (5th Cir. 1999) (en banc)).

93.     Courts look to whether a reasonable officer would believe each element of the offense of arrest for the case. *Logsdon v Hains*, 492 F3d 334 (6th Cir 2007).

**Fourth Amendment and Qualified Immunity**

94.     "[T]he fact that a neutral magistrate has issued a warrant authorizing the allegedly unconstitutional search or seizure does not end the inquiry into objective reasonableness." *Messerschmidt v. Millender*, 565 U.S. 535, 547 (2012).

95.     Even when officers obtain an arrest warrant from a magistrate, we ask "whether a reasonably well-trained officer in [the defendants'] position would have known that his affidavit failed to establish probable cause and that he should not have applied for a warrant." *Jennings v. Joshua Indep. Sch. Dist.*, 877 F.2d 313, 317 (5th Cir. 1989) (quoting *Malley v. Briggs*, 475 U.S. 335, 345 (1986)).

96.     "Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue." *Malley*, 475 U.S. at 341.

97.     A reasonably well-trained officer would have understood that arresting a city council member for private electronic messages, which were protected speech, clearly violates the First Amendment.

98.     "A government official may not base her probable cause determination on an 'unjustifiable standard,' such as speech protected by the First Amendment." *Mink v. Knox*, 613 F.3d 995, 1003–04 (10th Cir. 2010) (quoting *Wayte v. United States*, 470 U.S. 598, 608 (1985)). See also *Swiecicki v. Delgado*, 463 F.3d 489, 498 (6th Cir. 2006) ("[A]n officer may not base his probable-cause determination on speech protected by the First Amendment.").

### Legal Violations and Requested Relief

99.     Defendants acted outside of the scope of their authority and violated Plaintiff's clearly established rights under the **First Amendment** and **Fourth Amendment**.

100.     Plaintiff's words and conduct in this case constitute protected speech under the First Amendment. *Reno v ACLU*, 521 US 844; 117 S Ct 2329 (1997); *Kaplan v California*, 413 US 115; 93 S Ct 2680 (1973); *James v Meow Media, Inc*, 300 F3d 683 (6th Cir 2002).

101.     Plaintiff's words and conduct in this case did not present some grave and imminent threat that the government has the power to prevent. *Near v Minnesota ex rel Olson*, 283 US 697; 51 S Ct 625 (1931).

102.     Plaintiff's words and conduct in this case did not constitute fighting words. *Chaplinsky v New Hampshire*, 315 US 568; 62 S Ct 766 (1942).

103.     Plaintiff's words and conduct in this case were not speech that was integral to criminal conduct. *Giboney v Empire Storage & Ice Co*, 336 US 490; 69 S Ct 684 (1949).

104.    Plaintiff's words and conduct in this case did not constitute defamation. *New York Times Co v Sullivan*, 376 US 254; 84 S Ct 710 (1964).

105.    Plaintiff's words and conduct in this case did not constitute incitement to imminent lawlessness. *Brandenburg v Ohio*, 395 US 444; 89 S Ct 1827 (1969).

106.    Plaintiff's words and conduct in this case did not constitute fraud. *Virginia Bd of Pharmacy v Virginia Citizens Consumer Council, Inc*, 425 US 748; 96 S Ct 1817 (1976).

107.    Plaintiff's words and conduct in this case were not child pornography. *New York v Ferber*, 458 US 747; 102 S Ct 3348 (1982).

108.    Plaintiff's words and conduct in this case were not vulgar, lewd, indecent, or obscene. *Bethel School District No 403 v Fraser*, 478 US 675; 106 S Ct 3159 (1986); *Miller v California*, 413 US 15; 93 S Ct 2607 (1973).

109.    Plaintiff's words and conduct in this case were not part of any school-sponsored activity. *Hazelwood School District v Kuhlmeier*, 484 US 260; 108 S Ct 562 (1988).

110.    Plaintiff's words and conduct in this case did not advocate illegal drug use. *Morse v Frederick*, 551 US 593; 127 S Ct 2618 (2007).

111.    Plaintiff's words and conduct in this case were not a "true threat" as defined under state and federal jurisprudence. ("encompass[ing] those statements where the speaker means to communicate a serious expression of an intent to commit an act of unlawful violence to a particular individual or group of individuals").

112.    Plaintiff's words and conduct in this case were not communication made "for the purpose of issuing a threat, or with knowledge that the communication will be viewed as a threat," and could not possibly be considered a true threat under state and federal law. *Virginia v Black*, 538 US 343 (2003); *People v Gerhard*, COA: 354369 (Mich App

22

2021), Published June 24, 2021; *In re JP*, 330 Mich App 1; 944 NW2d 422 (2019);

*Elonis v United States*, 575 US 723; 135 S Ct 2001 (2015); *People v Osantowski*, 274

Mich App 593; 736 NW2d 289 (2007).

113.     And Plaintiff did not otherwise threaten, intimidate, harass, or coerce any person

in this case.

114.     Plaintiff is not being investigated for, and has not been charged with: (a)

terroristic threats under MCL 750.543m and MCL 750.543b(a), (b) transmitting in

interstate commerce "any communication containing any threat…to injure the person of

another" under 18 USC § 875(c), or (c) any other state or federal crime involving threats

or intimidation or any other violation of law.

115.     And Plaintiff's words and conduct do not constitute any other category of

unprotected speech under state or federal law.

116.     Further, Defendants committed **First Amendment retaliation** against Plaintiff.

*Thaddeus-X v Blatter*, 175 F3d 378 (6th Cir 1999).

117.     Further, Defendants illegally searched Plaintiff's social media account, where

Plaintiff had a protected privacy interest and a reasonable expectation of privacy in such

social media account, in violation of the **Fourth Amendment**.

118.     Further, Defendants arrested and maliciously prosecuted Plaintiff, without

probable cause, and in retaliation for Plaintiff's protected speech, in violation of the **First**

**Amendment and Fourth Amendment**.

119.     Further, Defendants had an **official municipal policy that was unconstitutional**

**on its face and as applied** (city charter section 5.8), had an **unofficial custom and**

**practice that was unconstitutional – with actual or constructive knowledge from**

**those at the policy making level** (city charter section 5.8; illegally searching Plaintiff's social media account; voting to hire and hiring a special prosecutor to prosecute Plaintiff for Plaintiff's exercise of free speech), acted with **deliberate indifference** and **failed to train and supervise its employees where there was an obvious need to train and supervise** (in First Amendment law and precedent and Fourth Amendment law and precedent). Further, the **decisions or acts of the final policy makers** for this case, even a single decision to take unlawful action by such municipal policy makers, are unconstitutional and give rise to liability for Defendants. *Monell v City of New York City Dep't of Social Servs*, 436 US 658 (1978); *Pembaur v City of Cincinnati*, 475 US 469 (1986); *City of Canton v Harris*, 489 US 378 (1989); *Burgess v Fischer*, 735 F3d 462 (6th Cir 2013). This violated Plaintiff's clearly established rights.

120.    Further, there is no sufficient post-deprivation remedy sufficient to absolve Defendants of its constitutional violations in this case. *Parratt v Taylor*, 451 US 527; 101 S Ct 1908 (1981).

121.    Further, the **city charter section 5.8** is an **unconstitutional policy, procedure, custom, and practice**, as applied to Plaintiff and facially.

122.    Further, Defendants **conspired** to violate Plaintiff's First Amendment and Fourth Amendment rights. 42 USC § 1985.

123.    This case seeks to protect and vindicate statutory and fundamental, clearly established constitutional rights.

124.    Plaintiff brings a civil rights action under the First Amendment and Fourth Amendment and Fourteenth Amendment to the United States Constitution and 42 USC §

1983 and for other statutory and constitutional violations, challenging Defendants' acts, policies, practices, customs, and procedures, which deprived Plaintiff of her rights.

125. Plaintiff brings this action for **money damages in the amount of 5 million dollars** – for *compensatory* and *punitive damages* – for Plaintiff's sustained and continued injuries, including but not limited to, pain and suffering, mental anguish, fright, shock, embarrassment, humiliation, mortification, damage to reputation, disruption of personal life, loss of enjoyment of the ordinary pleasures of living, medical conditions, post traumatic stress, loss of employment, and other damages known and unknown, as well as the following:

A. **prospective injunctive and declaratory relief** compelling Defendants to comply with federal law and to end a continuing and ongoing violation of federal law and Plaintiff's clearly established rights, including, but not limited to, violation of Plaintiff's First Amendment rights and violation of Plaintiff's Fourth Amendment rights. *Ex Parte Young*, 209 US 123; 28 S Ct 441 (1908); *S & M Brands, Inc v Cooper*, 527 F 3d 500 (6th Cir 2008)

B. a **declaration** that Defendants acted unconstitutionally and violated Plaintiff's clearly established rights by Defendants' continuing and ongoing violation of federal law, including, but not limited to, violation of Plaintiff's First Amendment rights and violation of Plaintiff's Fourth Amendment rights

C. **a declaration** that the section of the city charter 5.8 be declared unconstitutional

D. for **changes** to the **policies, practices, customs, and procedures** of Defendants regarding punishing citizens and city council members for constitutionally protected speech

E.   for **changes** to the **policies, practices, customs, and procedures** of Defendants regarding warrantless and suspicionless searches of an electronic device and social media accounts

F.   for an award of reasonable costs of litigation, including **attorney fees and costs**, pursuant to 42 USC § 1988 and other applicable law

## JURISDICTION AND VENUE

126.   This case arises under the Constitution and laws of the United States and of the State of Michigan.

127.   Jurisdiction is conferred on the Honorable Court pursuant to 28 USC § 1331, 28 USC § 1343, 42 USC § 1983, 42 USC § 1985, 42 USC § 1986, 42 USC § 1988, and other Federal and State laws and regulations – to redress violations of federal statutes and state law.

128.   The Honorable Court has supplemental jurisdiction regarding state law claims pursuant to 28 USC § 1367 because the state claims arise out of the same nexus of facts and events.

129.   This case arises from events that occurred in Calhoun County, which is in the Southern District. 28 USC § 102(b).

130.   The Honorable Court has subject matter jurisdiction pursuant to Article III of the United States Constitution, 28 USC § 1331 and 28 USC § 1343(a)(1), (2), (3), and (4).

131.   Declaratory relief and injunctive relief is authorized pursuant to the Declaratory Judgment Act, 28 USC § 2201 and 28 USC § 2202, by Rule 57 and Rule 65 of the Federal Rules of Civil Procedure, by the All Writs Act, 28 USC § 1651, and by the general legal and equitable powers of this court.

132.    Plaintiff's claims for damages are authorized pursuant to 42 USC § 1983, 42 USC

2000d-7, and by the general legal and equitable powers of this court.

133.    The amount in controversy exceeds the jurisdictional minimum of $75,000.00.

134.    Venue is appropriate pursuant to 28 USC § 1391. The individual defendants are

residents in the State in which this district is located and a substantial part of the events or

omissions giving rise to the claims occurred in this district.

135.    Plaintiff's claims are timely filed within the applicable statute of limitations. *Heck*

*v Humphrey*, 512 US 477; 114 SCt 2364 (1994); *Shamaeizadeh v Cunigan*, 182 F3d 391

(6th Cir 1999).

## PARTIES

136.    Plaintiff is a citizen of the United States, a citizen of the State of Michigan, and is

domiciled in Calhoun County, Michigan.

137.    Defendant, City of Albion, is a municipal entity, which is located in Calhoun

County, Michigan. City of Albion is established and organized under, and pursuant to,

the laws of the State of Michigan, with the authority to sue and be sued in its own name.

City of Albion has functions that include, but are not limited to, organizing, operating,

staffing, training, and supervising the staff and governing members of the City of Albion.

City of Albion is responsible for the managing, adopting, implementing, and enforcing of

all procedures, policies, customs, and practices, including, but not limited to the City of

Albion Charter and Code of Ordinances. City of Albion Department of Public Safety is a

municipal subdivision and administrative arm of the City of Albion. *Padilla v Twp of*

*Cherry Hill*, 110 F App'x 272 (3rd Cir 2004). Further, at all times relevant, City of

Albion acted and continues to act under color of state law. City of Albion violated Plaintiff's clearly established constitutional rights.

138.    Defendant, Albert Smith, was a City of Albion council member during all relevant times, and is an adult resident of the State of Michigan. Smith is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Smith was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Smith is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Smith is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of Ordinances. At all times relevant, Smith acted under color of law. Smith violated Plaintiff's clearly established constitutional rights.

139.    Defendant, Gleniane Reid, was a City of Albion council member during all relevant times, and is an adult resident of the State of Michigan. Reid is being sued in her individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Reid was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of her employment. Reid is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Reid is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of

Ordinances. At all times relevant, Reid acted under color of law. Reid violated Plaintiff's clearly established constitutional rights.

140.    Defendant, Shane Williamson, was a City of Albion council member during all relevant times, and is an adult resident of the State of Michigan. Williamson is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Williamson was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Smith is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Williamson is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of Ordinances. At all times relevant, Williamson acted under color of law. Williamson violated Plaintiff's clearly established constitutional rights.

141.    Defendant, David Atchison, was a City of Albion council member during all relevant times, and is an adult resident of the State of Michigan. Atchison is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Atchison was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Atchison is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Atchison is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of

Ordinances. At all times relevant, Atchison acted under color of law. Atchison violated Plaintiff's clearly established constitutional rights.

142.    Defendant, Scott Kipp, was the City of Albion Chief of Public Safety during all relevant times, and is an adult resident of the State of Michigan. Kipp is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Kipp was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Kipp is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Kipp is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of Ordinances. At all times relevant, Kipp acted under color of law. Kipp violated Plaintiff's clearly established constitutional rights.

143.    Defendant, Jason Kern, was the City of Albion Deputy Chief of Public Safety during all relevant times, and is an adult resident of the State of Michigan. Kern is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Kern was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Kern is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Kern is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of

Ordinances. At all times relevant, Kern acted under color of law. Kern violated Plaintiff's clearly established constitutional rights.

144.     Defendant, Cullen Harkness was the City of Albion City Attorney during all relevant times, and is an adult resident of the State of Michigan. Harkness is being sued in his individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Harkness was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Harkness is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Harkness is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City of Albion Charter and Code of Ordinances. At all times relevant, Harkness acted under color of law. Harkness violated Plaintiff's clearly established constitutional rights.

145.     Defendant, Nicole Wygant, was a Detective/Sergeant for the City of Albion Department of Public Safety during all relevant times, and is an adult resident of the State of Michigan. Wygant is being sued in her individual and official capacity for declaratory and injunctive relief and for money damages. At all times relevant, Wygant was an agent or employee of City of Albion and acted or failed to act within the scope, course, and authority of his employment. Wygant is responsible for the organizing, operating, staffing, training, and supervising the staff and agents of the City of Albion. Wygant is responsible for the managing, adopting, implementing, and enforcing of all City of Albion procedures, policies, customs, and practices, including, but not limited to, the City

of Albion Charter and Code of Ordinances. At all times relevant, Wygant acted under color of law. Wygant violated Plaintiff's clearly established constitutional rights.

146.     Defendant, Bruce Nelson, is an adult resident of the State of Michigan. Nelson conspired with the other defendants to violate Plaintiff's clearly established rights.

## STATEMENT OF FACTS

147.     On November 3, 2016, Plaintiff was duly elected to serve a four-year term as a council member for the City of Albion.

148.     Between November 2016 and November 2018, Plaintiff served as a council member for the City of Albion.

149.     Plaintiff was an outspoken and dedicated public servant.

150.     By November 2018, Plaintiff was also the Mayor Pro Tem for the City of Albion.

151.     In November 2018, Garrett Brown was the serving Mayor for the City of Albion.

152.     In November 2018, LaTonya Rufus was the serving City Manager for the City of Albion.

153.     Rufus began serving as the city manager on or about October 2018.

154.     In November 2018, Defendant, Albert Smith, was a serving council member for the City of Albion.

155.     In November 2018, Defendant, Gleniane Reid, was a serving council member for the City of Albion.

156.     In November 2018, Defendant, Shane Williamson, was a serving council member for the City of Albion.

157.     In November 2018, Defendant, David Atchison, was the incoming Mayor for the City of Albion.

158.    In November 2018, Defendant, Scott Kipp, was the serving Chief of Public Safety for the City of Albion.

159.    In November 2018, Defendant, Jason Kern, was the serving Deputy Chief of Public Safety for the City of Albion.

160.    In November 2018, Defendant, Cullen Harkness, was the serving City Attorney for the City of Albion.

161.    In November 2018, Defendant, Nicole Wygant, was a serving member of the City of Albion Department of Public Safety, upon information and belief.

162.    In November 2018, Defendant, Bruce Nelson, was a citizen residing in the City of Albion.

163.    In November 2018, Plaintiff, Mayor Garrett Brown, and LaTonya Rufus were friends who socialized together and spoke and communicated with each other outside of their respective roles as council member/Mayor Pro Tem (Plaintiff), Mayor (Garrett Brown), and City Manager (Rufus).

164.    In October 2018, Plaintiff, Garrett Brown, and LaTonya Rufus set up and established a Facebook Messenger Group Chat.

165.    Facebook Messenger is a proprietary instant messaging application and platform developed by Meta Platforms and originally developed as Facebook Chat in 2008.

166.    Facebook Messenger, through Meta, is a private platform that is used to send messages and exchange photographs, videos, stickers, audio, and files, which also supports voice and video calling.

**October-November 2018**

167.    Garrett Brown created the Facebook Messenger Group Chat on October 22, 2018.

168.    Garrett Brown, LaTonya Rufus, and Plaintiff were the three participants of the Facebook Messenger Group Chat.

169.    At all times relevant to this case, Plaintiff accessed the Facebook Messenger Group Chat through her private cellular phone, which was not issued through the City of Albion and not connected to the City of Albion in any way.

170.    In October 2018, Garrett Brown was the soon to be outgoing mayor for the City of Albion, with David Atchison being elected as mayor for the City of Albion.

171.    In October 2018, Plaintiff was a serving city council member for the City of Albion.

172.    In October 2018, LaTonya Rufus had just become the City Manager for the City of Albion.

173.    The Facebook Messenger Group Chat functionality allows for group participants to make voice calls to one another and to send written messages to one another.

174.    The entire Facebook Messenger Group Chat between Garrett Brown, LaTonya Rufus, and Plaintiff – from its creation until its last message – is attached as **Exhibit 1**. (Facebook Messenger Group Chat, **Exhibit 1**).

175.    **Exhibit 1** must be taken as a collective whole for the background and context of the verbal conversations and the written communication between Garrett Brown, LaTonya Rufus, and Plaintiff between October 22, 2018 (creation of Facebook Messenger Group Chat) and November 30, 2018 (last written message of the Facebook Messenger Group Chat).

176.    All verbal conversations and all written communication from **Exhibit 1** took place outside of any work hours for Garrett Brown, LaTonya Rufus, and Plaintiff in their capacity as Mayor, City Manager, and council member/Mayor Pro Tem.

177.    All verbal conversations and all written communication from **Exhibit 1** constituted personal time for Garrett Brown, LaTonya Rufus, and Plaintiff.

178.    None of the verbal conversations and written communication from **Exhibit 1** constituted any formal meeting or formal business for the City of Albion.

179.    Garrett Brown, LaTonya Rufus, and Plaintiff were speaking as private citizens, and in their capacity as private citizens, for all verbal and all written communication from **Exhibit 1**.

180.    **Exhibit 1** starts with two audio calls, equivalent to a phone call, between Garrett Brown, LaTonya Rufus, and Plaintiff on October 22, 2018.

181.    The second audio call started at 9:16 p.m. and ended at 10:47 p.m.

182.    Again, these calls took place outside of any work hours for Garrett Brown, LaTonya Rufus, and Plaintiff in their capacity as Mayor, City Manager, and council member/Mayor Pro Tem.

183.    Plaintiff does not recall the substance of each and every verbal conversation via audio call that took place between Garrett Brown, LaTonya Rufus, and Plaintiff as part of **Exhibit 1**.

184.    **Exhibit 1** has a screenshot of a "List of Members in City of Lanthrup Village," with the name of Dr. Sheryl Mitchell, PhD, listed as City Administrator.

185.    The City of Lanthrup Village website indicates that Sheryl Mitchell Theriot started work as Lathrup Village's city administrator on Monday, April 2, 2018.

"Previously, she served for nearly four years as the city manager for the community of Albion." (https://lathrup-mi.municodemeetings.com/directory-listing/sheryl-mitchell-theriot-0, last visited on December 21, 2022). (Reader view of webpage, **Exhibit 2**).

186.    Sheryl Mitchell was the City Manager for the City of Albion prior to LaTonya Rufus becoming the City Manager.

187.    **Exhibit 1** continues with audio calls on October 23, 2018 and October 24, 2018.

188.    While all audio calls and written communication that makes up **Exhibit 1** were conducted in the personal capacity of Garrett Brown, LaTonya Rufus, and Plaintiff, the subject matter of some of the audio calls and written communication that makes up **Exhibit 1** were matters of public concern, including, but not limited to, topics and subjects relevant to the City of Albion and City of Albion officials.

189.    **Exhibit 1** continues with a post from Plaintiff on October 25, 2018, which shows a screenshot of a Facebook post from Justin Seidler, "What. What's going on?," with replies as shown from Leslie Keller Dick, John Face, and Sheryl Mitchell.

190.    **Exhibit 1** continues with a screenshot of the continued replies from the Facebook post from Justin Seidler, with Leslie Keller Dick posting a message saying "[She] didn't start the fire…what else do I have to say?" and posting a YouTube clip of the Billy Joel song "We Didn't Start the Fire."

191.    John Face replies, "Leslie Keller Dick are you sure" and Sheryl Mitchell replies with a screenshot post with text that states, "What you do makes a difference, and you have to decide what kind of difference you want to make," which is a quote attributed to Dr. Jane Goodall.

192.   **Exhibit 1** continues with a Plaintiff written response, "Sheryl is out of line!!! I'm sick of her. What does that even mean? [emoji]."

193.   **Exhibit 1** continues with a written response from Garrett Brown, "She basically saying that you are going to be treated like you treat others."

194.   **Exhibit 1** continues with a written response from LaTonya Rufus, "Fyk her. Lol."

195.   **Exhibit 1** continues with a written response from Garrett Brown, "I her case I assume she feels wronged by LaTonya's comments so her and Louis's bs is warranted," then "*In."

196.   **Exhibit 1** continues with a written response from Plaintiff, "I'm with LaTonya [emoji] Fyk her."

197.   **Exhibit 1** continues with a written response from Plaintiff, "Why is karma taking wo so long? She is being professionally unethical."

198.   **Exhibit 1** continues with a written response from Garrett Brown, "It's just piling."

199.   For background and context of this conversation from October 25, 2018 between Garrett Brown, LaTonya Rufus, and Plaintiff, Sheryl Mitchell was the former city manager for the City of Albion and the successor of the sitting City Manager LaTonya Rufus.

200.   John Face was a local blogger and owner of the City News Watch Blog, which frequently published articles on topics and subjects relevant to the City of Albion.

201.   John Face is closely linked to council member Shane Williamson, Mayor David Atchison, and Chief of Public Safety Scott Kipp, all Defendants for this case.

202.    The October 25, 2018 exchange between Garrett Brown, LaTonya Rufus, and Plaintiff was about the posting by Leslie Keller Dick and Sheryl Mitchell, which Garrett Brown, LaTonya Rufus, and Plaintiff all perceived as taking a swipe at, and insulting, LaTonya Rufus, who had just started as City Manager for the City of Albion.

203.    The deeper background and context is that Garrett Brown, LaTonya Rufus, and Plaintiff believed that former city manager Sheryl Mitchell was not sufficiently doing her job and not acting as a watchdog for the residents of the City of Albion.

204.    Plaintiff believed that Sheryl Mitchell was part of a pattern of corruption amongst City of Albion officials.

205.    **Exhibit 1** continues with an audio call on October 18, 2018 at 11:18 a.m.

206.    **Exhibit 1** continues on November 7, 2018 with a Facebook Uniform Resource Locator (URL) link and then a message underneath that says, "Attachment Unavailable."

207.    Plaintiff does not recall the substance of the Facebook URL link and unavailable attachment.

208.    **Exhibit 1** continues with an audio call from November 7, 2018 started by LaTonya Rufus.

209.    **Exhibit 1** continues with a written message from LaTonya Rufus on November 7, 2018, which states, "He would get paid $460,000."

210.    For background and context of this written message from LaTonya Rufus on November 7, 2018, there was a verbal discussion about former city manager Sheryl Mitchell revising the employment contract for Chief of Public Safety Scott Kipp to include a provision that Scott Kipp would receive a $460,000.00 payout in the event that Scott Kipp was forced out and removed from office.

211.    This was Plaintiff's understanding of the contract revision that Sheryl Mitchell implemented for Scott Kipp.

212.    Plaintiff viewed this contract revision as a parting gift to Scott Kipp from Sheryl Mitchell – and part of the pattern of corruption for City of Albion officials.

213.    So when LaTonya Rufus states, "He would get paid $460,000," this is what is being referenced.

214.    **Exhibit 1** continues with another audio call from November 7, 2018.

215.    **Exhibit 1** continues on November 9, 2018, with a written message from LaTonya Rufus that says, "My bad. I'm so sorry."

216.    Garrett Brown answers, "No problem [emoji]" and Plaintiff responds, "No worries! It's cool."

217.    Plaintiff does not recall the background and context of these written messages from November 9, 2018.

218.    **Exhibit 1** continues with a written message from LaTonya Rufus, which says "Y would he send that" and a written response from Plaintiff that says, "We got u, Ms. Rufus! [emoji]" and "Crazy and wishful thinking…"

219.    For background and context of these written messages from November 9, 2018, Chief of Public Safety Scott Kipp had still been sending emails out through the City of Albion that listed Scott Kipp as the Interim City Manager for the City of Albion, even though LaTonya Rufus had been named and was serving as the City Manager for the City of Albion.

220.    Plaintiff and Garrett Brown and LaTonya Rufus found Scott Kipp's continued use of the title "Interim City Manager" disrespectful to LaTonya Rufus.

221.   Accordingly, Plaintiff and Garrett Brown and LaTonya Rufus were talking about their feelings regarding Scott Kipp's disrespectful actions.

222.   **Exhibit 1** continues with Garrett Brown stating, "The "[emojis]" were directed at Scott.

223.   **Exhibit 1** then continues with Plaintiff's written response, "Get rid of him! He's untrustworthy."

224.   Plaintiff's written response of "Get rid of him! He's untrustworthy" is the baseline subject that formulated an unlawful search of a cellular phone and social media account, a criminal charge and loss of liberty for Plaintiff, a not guilty verdict for Plaintiff in the Calhoun County 10th District Court, and this federal Complaint.

225.   Plaintiff's written response of "Get rid of him! He's untrustworthy" was written in a group chat with Garrett Brown and LaTonya Rufus – in Plaintiff's individual capacity as a private citizen.

226.   Plaintiff's written response of "Get rid of him! He's untrustworthy" was not a directive to anyone.

227.   Plaintiff's written response of "Get rid of him! He's untrustworthy" was not a directive to do anything.

228.   Plaintiff's written response of "Get rid of him! He's untrustworthy" was protected political speech, written in Plaintiff's capacity as a private citizen, from a private cell phone, during non-work hours, in non-work capacity regarding Plaintiff's role as a city council member for the City of Albion, and was made regarding a matter of public concern, specifically allegations that Chief of Public Safety Scott Kipp was rude, insubordinate, and was undermining City Manager LaTonya Rufus (see above with Scott

Kipp continuing to claim to be Interim City Manager in emails), as well as allegations that Scott Kipp owed hundreds of dollars in unpaid cell phone bills associated with the City of Albion, and that LaTonya Rufus believed that Scott Kipp was monitoring the phone of LaTonya Rufus. (Council Memorandum, **Exhibit 3**; Statement from Plaintiff, **Exhibit 4**; Formal Complaint from Plaintiff, **Exhibit 5**; Addendum, **Exhibit 6**).

229.    Plaintiff's written response of "Get rid of him! He's untrustworthy" constitutes the free discussion of governmental affairs. [This, of course, includes discussions of the candidates, structures, and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes. *Mills v Alabama*, 384 US 214 (1966)]; *Supra*.

230.    Plaintiff's written response of "Get rid of him! He's untrustworthy" is clearly established as protected political speech.

231.    As written by Plaintiff in **Exhibit 3**, Plaintiff's written response of "Get rid of him! He's untrustworthy" was not a directive to do anything.

232.    Plaintiff's written response of "Get rid of him! He's untrustworthy" was a reminder that City Manager LaTonya Rufus was the person that had administrative authority over personnel, including terminating employees that are insubordinate and/or in debt to the City of Albion.

233.    It is noteworthy that City Manager LaTonya Rufus had just started her position as City Manager on or about October 2018.

234.    Plaintiff has been on record with all of this information and background and context from the moment that Plaintiff discovered that her private Facebook Messenger messages were being distributed to the public.

235.    Beyond a throw-away reference to Attachment 3, none of the background and context of any of Plaintiff's protected speech ever made its way into the subsequent Thrun Report (*infra*) and the 2-page police report against Plaintiff (*infra*), which constitute the basis of the criminal charge that was eventually waged against Plaintiff by Defendants.

236.    **Exhibit 1** continues with a screenshot of Chief of Public Safety Scott Kipp talking about his use of "Interim City Manager" in emails, with Scott Kipp's response, "That was off the remote desk top. I rarely ever use it."

237.    **Exhibit 1** continues with a written message from LaTonya Rufus saying "BS" then "[thumbs up emoji] 2."

238.    **Exhibit 1** continues with Plaintiff posting an emoji and then Plaintiff's written response, "Isn't the personal phone bill enough to terminate Scott?...And Corisha?...Has the labor atty responded to your inquiry?."

239.    For continued background and context, Caresha Kendrick was the administrative assistant of Chief of Public Safety Scott Kipp on or about November of 2018.

240.    Kendrick was also a part-time human resources employee for the City of Albion.

241.    **Exhibit 1** continues with a written response from LaTonya Rufus, "Not yet…I'm just upset at the mess."

242.    **Exhibit 1** continues with Plaintiff's written response, "Scott needs to go, Ms. Rufus. One less worry!...He knew he wasn't paying his bill!! And he should've known about Carisha! That's bs…Sheryl is gone and there's a new Sheriff in town! [emoji]."

243.    For continued background and context, Plaintiff and LaTonya Rufus are discussing, in their personal capacity, allegations that Chief of Public Safety Scott Kipp

has engaged in misconduct regarding City of Albion issued cellular phones and the payment of bills associated with those cellular phones, which is a matter of public concern and protected political speech.

244.    **Exhibit 1** continues with a written statement from LaTonya Rufus, "He claims Bonnie didn't tell him…That heifer called me…I'm sick of them."

245.    **Exhibit 1** continues with a written response from Plaintiff, "Bonnie didn't tell him what? He knew he wasn't paying his bill…Sheryl is about to have her own plate full with this ICMA complaint [emoji]."

246.    For background and context, Plaintiff is referencing an International City/County Management Association (ICMA) complaint associated with former City of Albion City Manager Sheryl Mitchell.

247.    **Exhibit 1** continues with a written response from LaTonya Rufus, "Bonnie and Scott both claimed he paid it…I'm sick of this mess…They are all liars."

248.    **Exhibit 1** continues with Plaintiff's written response, "Where's the receipts? Proof? Who owes then?" and the written response from LaTonya Rufus, "It should be in the system."

249.    **Exhibit 1** then continues with a screenshot of an email that Scott Kipp sent to Plaintiff regarding a traffic collision that Plaintiff was involved in where Plaintiff was rear-ended, with Plaintiff stating, "Fyi….our police dept is a joke!"

250.    Plaintiff then states, "Fyi…I didn't have much to tell him because I still don't know what happened from my own recollection. Hell, I was hit. The end. [emojis]."

251.    For background and context, Plaintiff is referring to a vehicle collision that occurred in Plaintiff's own personal vehicle, on Plaintiff's private time, but where there was a response from the City of Albion Department of Public Safety.

252.    Plaintiff did not believe that the City of Albion Department of Public Safety response was adequate.

253.    Plaintiff then states, "Fyi, Marcola's son hit me. It's good enough. We are working it out."

254.    Plaintiff then attaches another screenshot of a text conversation between Plaintiff and Scott Kipp.

255.    **Exhibit 1** continues on November 12, 2018 at 6:31 p.m. with LaTonya Rufus and her written statement that, "I'm in the house."

256.    **Exhibit 1** continues with a screenshot of an email exchange between LaTonya Rufus and Scott Kipp regarding Scott Kipp using "Interim City Manager" in his title while emailing on a City of Albion account.

257.    **Exhibit 1** continues with an audio call started by Garrett Brown on Saturday, November 17, 2018 at 9:45 a.m., which ends at 9:46 a.m.

258.    **Exhibit 1** continues with an audio call started by Garrett Brown on November 28, 2018 at 9:44 p.m. – non-work hours – which ended at 9:51 p.m.

259.    **Exhibit 1** concludes with a written message from Plaintiff on November 30, 2018 that says, "Ms. Rufus, please call Cullen. He's a snake but he is not going to risk losing his license for Kipp, Sheryl, or anybody else. [emoji] He will give you your legal options on dealing with Kipp."

**January 2019**

260.    In January 2019, a formal investigation occurred regarding LaTonya Rufus and

allegations that LaTonya Rufus misused or embezzled City of Albion funds.

261.    Thomas Mead, then financial director/treasurer for the City of Albion, discovered

a credit card issued by the City of Albion that Mead believed contained suspicious

charges.

262.    Mead had tracked the suspicious credit card transactions to LaTonya Rufus, then

City Manager for the City of Albion.

263.    On or about January 22, 2019, Defendant Mayor David Atchison placed LaTonya

Rufus on administrative leave, based upon LaTonya Rufus not turning in moving expense

receipts and the allegations of improper conduct against LaTonya Rufus.

264.    Defendant City Attorney Cullen Harkness communicated the matter of the

suspicious credit card transactions and allegations against LaTonya Rufus to the Calhoun

County Sheriff's Office.

265.    And on January 28, 2019, then Sheriff Matthew Saxton contacted Calhoun

County Sheriff Officer Steven Hinkley to begin a formal investigation against LaTonya

Rufus for allegations of embezzlement.

266.    Calhoun County Sheriff Officer Steven Hinkley conducted a detailed

investigation into the allegations of embezzlement by LaTonya Rufus. (Hinkley report,

**Exhibit 7**).

267.    **Exhibit 7** is relevant to this Complaint because of the directives and actions taken

by Defendant City Attorney Cullen Harkness and Defendant Chief of Public Safety Scott

Kipp for the City of Albion.

268.    Contemporaneous to LaTonya Rufus being placed on administrative leave by city council on January 24, 2019, City Attorney Cullen Harkness (Harkness) directed Chief of Public Safety Scott Kipp (Kipp) to confiscate the City of Albion issued cellular phone and laptop computer from LaTonya Rufus.

269.    Kipp confiscated the City of Albion issued cellular phone and laptop computer from LaTonya Rufus on or about January 23, 2019, upon information and belief.

270.    Thomas Mead references Kipp's actions in confiscating the City of Albion issued cellular phone and laptop computer in the Hinckley report that is **Exhibit 7**. See page 7, paragraph 2; page 12, paragraph 5.

271.    Pursuant to Kipp's own statement in **Exhibit 7**, on January 23, 2019, Harkness directed Kipp to confiscate the City of Albion issued cellular phone and laptop computer from LaTonya Rufus.

272.    On January 23, 2019, Kipp travelled to the personal home of LaTonya Rufus and confiscated the City of Albion issued cellular phone and laptop computer from LaTonya Rufus. **Exhibit 7**; page 13, paragraph 5.

273.    Pursuant to Kipp's statement in **Exhibit 7**, Kipp received the passcode for the city issued cellular phone and began searching through the cellular phone, without any search warrant. *Riley v California*, 573 US 373 (2014). **Exhibit 7**, page 13, paragraph 6; page 14, paragraph 2.

274.    Pursuant to Kipp's statement in **Exhibit 7**, Kipp "worked administratively and talked with [City Attorney Harkness]." *Id*. at paragraph 2.

275.    Kipp reported that text messages and phone contacts were deleted from the city issued cellular phone that Kipp confiscated from LaTonya Rufus. *Id*.

276.    Kipp advised that Harkness instructed Kipp to use applications on the city issued

cellular phone that was confiscated from LaTonya Rufus to attempt to recover the deleted

text messages.

277.    Kipp continued his warrantless search of the city issued cellular phone

confiscated from LaTonya Rufus, at the direction of City Attorney Harkness. *Carpenter v*

*United States*, 138 SCt 2206 (2018).

278.    **Exhibit 7** states, "[Kipp] advised he was instructed to use some applications on

the phone in an attempt to recover the deleted text messages. [Kipp] advised he believes

he used four different apps. Three were trial apps and one he paid for. [Kipp] indicated he

remembered that one of the phone apps was "Phone Rescue." [Kipp] advised he was

unable to recover any of the deleted text messages." **Exhibit 7**, page 14, paragraph 2.

279.    **Exhibit 7** continues, "[Kipp] advised that during his administrative inspection of

the Albion City phone, he accessed Rufus's (sic) Facebook Messenger and he discovered

several different messages between Rufus, Sonia Brown (sic) [Plaintiff] and Garrett

Brown. [Kipp] advised that Sonia Brown (sic) was a council member and Garrett Brown

was the mayor of the City of Albion until December 31, 2018. He advised that those

messages were relating to personnel issues and he said he screenshotted those messages

on his cell phone and showed me those messages. It appeared that they had been

discussing personnel issues on the private Facebook Messenger and I asked Kipp to send

me those screenshots, which he did. I will add them to the RMS report and I will scan

them into RMS." **Exhibit 7**, page 14, paragraph 4.

280.    There is no legal justification, under any warrant exception, to Kipp's warrantless

search of the cellular phone that was confiscated from LaTonya Rufus, which was

directed by City Attorney Cullen Harkness. See *Riley v California*, supra; see *Carpenter v United States*, supra; *United States v Lichtenberger*, 786 F3d 478 (6th Cir 2015).

281. And it was the warrantless and unlawful search described in **Exhibit 7** that discovered the private Facebook Messenger Group Chat messages between Plaintiff, Garrett Brown, and LaTonya Rufus (**Exhibit 1**), which formulates the violation of Plaintiff's clearly established rights for this case.

282. Plaintiff had and has a reasonable expectation of privacy in the private Facebook Messenger Group Chat messages that Plaintiff sent to Garrett Brown and LaTonya Rufus, which were obtained unlawfully by Kipp and Harkness. *Hinton*, *supra*.

283. For the record, Officer Hinkley ultimately obtained a search warrant through his investigation and recommended charges against LaTonya Rufus for embezzlement.

284. LaTonya Rufus was ultimately charged with felony embezzlement and pleaded guilty to misdemeanor embezzlement and was sentenced to probation and to pay restitution.

285. On January 23, 2019, upon information and belief, Defendant. Albert Smith, filed a written request for a recall petition pursuant to MCL 168.955 – in effort to remove Plaintiff from office as a city council member for the City of Albion.

286. Defendant, Albert Smith, used language in the recall petition that he filed, which alleged that Plaintiff violated City of Albion Charter Section 5.8 by sending an electronic message directing City Manager LaTonya Rufus to remove Scott Kipp from head of Albion's public safety department.

287. This was false. Plaintiff never directed anyone to do anything in the private Facebook Messenger messages that she sent in November 2018.

288.    But Defendant, Albert Smith, received leaked information from an unknown source; and Defendant, Albert Smith, filed a petition to recall and remove Plaintiff from office as a city council member of the City of Albion.

289.    Defendant, Albert Smith, later withdrew his recall petition that he filed on January 23, 2019.

**February 2019**

290.    Upon information and belief, information regarding private Facebook Messenger messages sent between Plaintiff, Garrett Brown, and LaTonya Rufus, between October 2018 and November 2018, leaked to John Face, the local Albion blogger.

291.    Plaintiff does not know the exact source of who leaked information, but Plaintiff has surmised that Kipp leaked this information to John Face, as Kipp was the one who unlawfully searched the City of Albion issued cellular phone that Kipp confiscated from LaTonya Rufus on January 23, 2019.

292.    On February 19, 2019, Plaintiff became aware that Plaintiff's private Facebook Messenger messages sent between Plaintiff, Garrett Brown, and LaTonya Rufus were leaked to John Face.

293.    On February 19, 2019, Plaintiff had a phone conversation with Defendant Jason Kern.

294.    Defendant Kern advised Plaintiff that Defendant Scott Kipp had accessed the City of Albion cellular phone and the private Facebook Messenger messages between Plaintiff and Garrett Brown and LaTonya Rufus without a search warrant.

295.    Defendant Kern was well-aware that Kipp's warrantless search of this cellular phone from LaTonya Rufus, which was directed by Defendant Cullen Harkness, was a violation of the law and unlawful.

296.    But Defendant Kern did nothing to publicly stop the unlawful actions of Defendant Kipp and Defendant Harkness.

297.    In email exchanges between Plaintiff and Defendant Harkness, Defendant Harkness asserts that Defendant Harkness asked Defendant Kipp to look at the cellular phone from LaTonya Rufus for text messages only, which would still be an unlawful warrantless search.

298.    But Defendant Kipp's statement to Officer Steven Hinkley was that Defendant Kipp "worked administratively and talked to the city attorney" and that "during his administrative inspection of the Albion City phone, [Kipp] accessed Rufus's Facebook Messenger and he discovered several different messages between Rufus, Sonia Brown (sic) and Garrett Brown." **Exhibit 7**, page 14, paragraphs 2 and 4.

299.    The only conclusion to be drawn is that Defendant Kipp unlawfully searched the cellular phone of LaTonya Rufus, and unlawfully accessed the private Facebook Messenger messages between Plaintiff and Garrett Brown and LaTonya Rufus, at the direction of Defendant Cullen Harkness.

300.    On February 25, 2019, John Face published an article via City Watch News, which stated, "3rd Precinct Council member Sonya Brown has had recall petition language filed with the Calhoun County Clerk's office. It's alleged that council member Brown advocated for firing of Albion Department of Public Safety Chief Scott Kipp. The allegations of this violation of City Charter are based on messages between City Manager

LaTonya Rufus, Ms. Brown, and with Garrett Brown a part of the conversation yet not commenting. These are very serious charges and a breach of public trust. The City Charter forbids Council members advocating for or against an employee of the city. I have attached a copy of the messages which are interesting at best. Stay tuned for tomorrow for more information."

301.    John Face then published a pdf attachment, which contains a portion of the private Facebook Messenger Messages between Plaintiff and Garrett Brown and LaTonya Rufus from October 2018 through November 2018. (Screenshot of City Watch News Facebook post from John Face, **Exhibit 8**; pdf file with portion of messages, **Exhibit 9**).

302.    On February 25, 2019, Defendant, Bruce Nelson, filed a recall petition against Plaintiff, which used identical language to the recall petition that Defendant, Albert Smith, filed on January 23, 2019. (Recall Petition, **Exhibit 10**).

303.    The leaking of the private Facebook Messenger messages, the multiple recall petitions filed against Plaintiff, and John Face publishing the hit piece and City Watch News article against Plaintiff were all part of a coordinated effort against Plaintiff – by Defendant Albert Smith, by Defendant David Atchison, by Defendant Scott Kipp, and by Defendant Bruce Nelson.

304.    Between February 22, 2019 and February 26, 2019, Plaintiff exchanged emails with Defendant Cullen Harkness and labor attorney Chelsea Ditz.

305.    Defendant Harkness and attorney Ditz both denied knowing how Defendant Kipp accessed Plaintiff's private Facebook Messenger messages.

**March 2019**

306.    On March 1, 2019, a special city council meeting was held.

307.    Plaintiff made public comments about the leaking of the private Facebook Messenger messages and the allegations against Plaintiff.

308.    Portions of the special city council meeting are available on YouTube: https://www.youtube.com/watch?v=izo74wWDcRM&t=98s (last visited on December 28, 2022).

309.    Plaintiff also submitted her concerns about the warrantless and unlawful search of the LaTonya Rufus cellular phone to the Michigan State Police and to the Michigan Attorney General's Office.

310.    Plaintiff also sought to appoint a different interim city manager than Defendant Scott Kipp, who had gone back to his role as interim city manager for the City of Albion.

311.    However, a majority of the City of Albion city council voted to retain Defendant Scott Kipp as interim city manager.

**May 2019**

312.    On November 24, 2018, members of the Albion Department of Public Safety (ADPS) were involved in an event where members of ADPS punched and pepper sprayed a mentally ill 13-year old boy.

313.    This event received media attention. (Reader view article, **Exhibit 11**).

314.    Plaintiff was outspoken about her distaste with Defendant Kipp's response to this event.

315.    A city council meeting was held on May 6, 2019, where Plaintiff made public comments regarding the ADPS event as described above.

316.    Plaintiff's comments can be viewed on YouTube.

(https://www.youtube.com/watch?v=iNKZKVK1pug, last viewed on December 28, 2022).

317.    A special city council meeting was called on May 13, 2019.

318.    Plaintiff made public comments about the ADPS event as described above at this special meeting.

319.    Plaintiff's comments can be viewed on YouTube.

(https://www.youtube.com/watch?v=PyWJ9Xsh6pA, last viewed on December 28, 2022).

**August 2019**

320.    On August 13, 2019, Defendant Kipp submitted a formal complaint against Plaintiff.

321.    Defendant Kipp alleged that Plaintiff was harassing and defaming Defendant Kipp. (Kipp Complaint, **Exhibit 12**).

322.    Plaintiff formally responded to **Exhibit 12** with Plaintiff's Council Memorandum, **Exhibit 3**.

323.    While continuing to serve in city council, Plaintiff made a motion to investigate Defendant Kipp's harassment complaint.

324.    Defendant Kipp's complaint against Plaintiff was a hit piece, and it came right in the midst of election season and the recall petition and recall election that Plaintiff was facing.

**November 2019**

325.    On November 8, 2019, Plaintiff was voted out of office as a member of city council through the recall petition effort.

326.    Unfortunately for Plaintiff, the efforts of Defendant Albert Smith, Defendant David Atchison, Defendant Scott Kipp, and Defendant Bruce Nelson worked to vote Plaintiff out of office.

327.    Defendant Albert Smith secured more votes than Plaintiff in the recall election.

**December 2019**

328.    After Plaintiff was voted out of office, Defendant Kipp attempted to rescind his harassment complaint against Plaintiff – further evidence that the harassment complaint was nothing but a political play in effort to try to remove Plaintiff from the city council.

329.    On December 2, 2019, the City of Albion city council voted to proceed with an investigation against Plaintiff – even though Plaintiff had been voted out of office.

330.    The City of Albion city council voted to hire attorney Timothy Gardner of the Thrun Law Firm to conduct an investigation into Defendant Kipp's harassment complaint.

331.    Plaintiff voluntarily met with attorney Timothy Gardner for an interview on December 30, 2019.

**January 2020**

332.    Attorney Timothy Gardner conducted additional interviews on January 8, 2020, January 13, 2020, January 21, 2020, and January 22, 2020.

**February 2020**

333.    On February 21, 2020, attorney Timothy Gardner submitted his report and conclusions. (Thrun Report, **Exhibit 13**).

334.    The Thrun Report concluded the following: (a) Plaintiff did not commit harassment or defamation against Defendant Kipp, (b) Plaintiff's conduct in sending private Facebook Messenger messages (**Exhibit 1**) constituted a violation of City of Albion Charter 5.8 and City of Albion Code of Ordinances 1-28 (Ethics).

335.    Plaintiff agrees that Plaintiff did not commit any defamation or harassment against Defendant Kipp.

336.    Plaintiff denies all allegations that Plaintiff violated any City of Albion charter section or City of Albion ordinances, as alleged in the Thrun Report.

337.    The Thrun Report is a myopic document, which contains virtually no background and context for any private Facebook Messenger messages that Plaintiff sent to Garrett Brown and LaTonya Rufus, despite the fact that Plaintiff provided all documentation and background and context of such messages to attorney Timothy Gardner.

338.    The Thrun Report contains a passing reference to Attachment 3, which is one public statement that Plaintiff made in response to allegations that Plaintiff "directed" anyone or anything with Plaintiff's private Facebook Messenger message from November 2018 that said, "Get rid of him! He's untrustworthy."

339.    The Thrun Report does not provide any analysis of explanation of Plaintiff's written response in Attachment 3.

340.    Much of the Thrun Report's 14 pages contain the cut and pasted language from the City of Albion Charter and Code of Ordinances.

341.    The Thrun Report also does not contain any discussion or analysis of the First Amendment, which is a gross omission.

342.    The Thrun Report contains shoddy factual and legal analysis.

343.    The Thrun Report provides two lines regarding Plaintiff's position on Plaintiff's own words: "In regards to the Facebook Messenger messages (See Attachment 4), Councilwoman Brown alleges that then City Manager LaTonya Rufus was telling Councilwoman Brown about Chief Kipp owing hundreds of dollars to the City for unpaid cellphone bills. Ms. Brown indicated that she reminded Ms. Rufus that only the City Manager could hire/fire a City employee."

344.    But the Thrun report makes no other reference to Plaintiff's position and explanation and then just concludes, without analysis, that Plaintiff's "Get rid of him!" comment "had the practical effect of ordering Ms. Rufus to remove Chief Kipp from his position as the City's Chief of Public Safety, which violated Section 5.8 of the City Charter." (Thrun Report, page 12).

345.    The Thrun Report's shoddy conclusion is totally false.

346.    Section 5.8 of the City of Albion Charter states, "The council members shall not individually direct the appointment or removal of any administrative officer or employee of the city and shall deal with the administrative service of the city only through the city manager, as to officers and employees made responsible to him."

347.    Section 5.8 of the City of Albion Charter also states, "There shall be no standing committees of the council."

348.    Section 5.8 of the City of Albion Charter is unconstitutionally vague and overbroad, as explained below, both facially and as applied to Plaintiff.

349.    But the word "direct" is not defined anywhere in the City of Albion Charter of City of Albion Code of Ordinances.

350.    A common dictionary definition of the word "direct" has the definitions: (a) to cause to turn, move, or point undeviatingly or to follow a straight course, (b) to regulate the activities or course of. (https://www.merriam-webster.com/dictionary/direct, last visited December 29, 2022).

351.    A directive is an action and not simply words.

352.    While Plaintiff may have had a private opinion that Defendant Kipp should no longer be employed by the City of Albion, it is undisputed that Plaintiff took no actions to remove Defendant Kipp from his employment as Chief of Public Safety for the City of Albion.

353.    LaTonya Rufus took no actions to remove Defendant Kipp from his employment as Chief of Public Safety for the City of Albion.

354.    No other person took any actions to remove Defendant Kipp from his employment as Chief of Public Safety for the City of Albion.

355.    Plaintiff did not "cause to move" any process to remove Defendant Kipp from his employment as Chief of Public Safety for the City of Albion.

356.    Plaintiff did not regulate the activities or the course of any removal of Defendant Kipp from his employment as Chief of Public Safety for the City of Albion.

357.    Plaintiff was expressing Plaintiff's opinion in a private Facebook Messenger Group Chat, after hours, and in Plaintiff's individual capacity as a private citizen, which is protected political speech.

358.    Plaintiff's subjective intent and the background and context of the statement, "Get rid of him!" must be taken into account – and the Thrun Report disregarded such factors without analysis.

359.    The Thrun Report does not even mention the fact that this communication of "Get rid of him!" was made from a private device, outside of work hours, during Plaintiff's private time, and not in any capacity as Plaintiff's role as a city council member.

360.    The Thrun Report does not contain the remainder of the messages from **Exhibit 3** of this Complaint, which demonstrate the insubordination and disrespect from Defendant Kipp towards LaTonya Rufus, which formulated the basis of Plaintiff's private opinion in her written response to say, "Get rid of him!"

361.    The Thrun Report is a facile document.

362.    The Thrun Report has material omissions regarding background and context and the intent of any statements made between Plaintiff, Garrett Brown, and LaTonya Rufus.

363.    In sum, the Thrun Report is an extremely poor representation of the history and background between Plaintiff and all of the named defendants for this case.

364.    However, the Thrun Report constitutes the factual and legal basis for the criminal complaint that was ultimately waged against Plaintiff by the named defendants.

**March 2020**

365.    On March 16, 2020, Defendant Albert Smith, Defendant Gleniane Reid, Defendant Shane Williamson, and Defendant David Atchison all voted to hire a special prosecutor to criminally prosecute Plaintiff based upon the shoddy and false conclusions from the Thrun Report.

366.    The named defendants for this case caused Plaintiff to be prosecuted.

367.    Attorney Patrick O'Keefe was ultimately hired as special prosecutor.

**May 2020**

368.    On May 14, 2020, Defendant Cullen Harkness contacted Defendant Nicole

Wygrant, who was a Detective/Sergeant for the City of Albion Department of Public

Safety.

369.    Defendant Harkness "requested that [Defendant Wygrant] generate a report

number in reference to SONYA BROWN violating the Charter. Specifically section 2.5

(Penalties for violations of charter) and 2.8 (Restrictions on powers of the council) of the

Charter). (Police Report, **Exhibit 14**).

370.    In taking this action, Defendant Harkness participated in and influenced the

decision to criminally prosecute Plaintiff.

371.    Defendant Harkness did more than just passive cooperation.

372.    Defendant Harkness aided in the decision to criminally prosecute Plaintiff.

373.    Further, **Exhibit 14** is a two page document, where page 1 is just the "Incident

Location," "Incident Offenses," "Officers Involved," and "Incident People."

374.    Page 2 of **Exhibit 14** is one sentence long.

375.    Defendant Wygrant failed to ever speak with or interview Plaintiff.

376.    Defendant Wygrant did not even attempt to speak with or interview Plaintiff.

377.    **Exhibit 14** does not contain any of Plaintiff's public comments or public

statements or responses to the "Get rid of him!" written response in the private Facebook

Messenger message sent in November 2018.

378.    The material omissions of any of Plaintiff's public comments or public statements

or responses is relevant to any examining magistrate's determination of probable cause to

issue an arrest warrant and the criminally charge Plaintiff and infringe upon Plaintiff's liberty.

**June 2020**

379. On June 1, 2020, Defendant David Atchison filed a Complaint in the Calhoun County 37th Circuit Court, Case No.: 20-1114-NZ, the Honorable Sarah S. Lincoln presiding, where Defendant Atchison alleged that Plaintiff was defaming Defendant Atchison. (Defamation Complaint, **Exhibit 15**).

380. Defendant's Atchison's defamation lawsuit against Plaintiff was baseless and lacked all merit; and it was ultimately dismissed.

381. Defendant Atchison's lawsuit shows a pattern of using the legal system as a sword against one's political enemies (Plaintiff) – just as Defendant Atchison conspired with other named Defendants and voted for criminal prosecution against Plaintiff.

382. On June 16, 2020, special prosecutor Patrick O'Keefe signed a warrant request to criminally prosecute Plaintiff for an allegation that Plaintiff violated City of Albion Charter Section 5.8. (Misdemeanor Complaint, **Exhibit 16**).

383. Plaintiff had to be arraigned for this allegation of criminal misconduct and violation of the law.

384. Plaintiff was placed on bond conditions with the 10th District Court for Calhoun County, Case Number 20-205559-OM, the Honorable Michelle L. Richardson presiding.

385. Plaintiff suffered loss of liberty through being placed on trial and having bond conditions imposed, which limited Plaintiff's freedom of movement and limited Plaintiff's actions.

**City of Albion Charter**

386.   The City of Albion Charter is found by visiting:

https://library.municode.com/mi/albion/codes/code_of_ordinances (last visited on

December 29, 2022).

387.   Chapter 2 is "Definitions and General Provisions," which states in Section 2.5:

"Any person found guilty of an act constituting a violation of this charter may be

punished by a fine which, in addition to court costs charged to him, shall not exceed five

hundred dollars ($500.00) or imprisonment for not more than ninety (90) days, or both

such fine and imprisonment, in the discretion of the court. This section shall not operate

to limit or prejudice the power to remove officers or discharge employees as provided in

this charter."

388.   Section 2.5 of the City of Albion Charter is what would be commonly referred to

as a penalty provision for any city code of ordinances.

389.   But Section 2.5 is not contained within the "offenses" section of the City of

Albion Code of Ordinances, which governs crimes against a person, against property,

against public order, etc.

390.   Instead, Section 2.5 is contained within the "Definitions and General Provisions"

section of the City of Albion Charter.

391.   Under the apparent interpretation of the Defendant City Attorney Harkness, this

means that any "act constituting a violation of this charter" would subject an individual to

criminal penalties and sanctions.

392.   For example, Chapter 26 of the City of Albion Cod of Ordinances, with is a part

of the City of Albion Charter, deals with Cable Communications.

393.    Section 26-33 Meetings states, in pertinent part, "Generally. It shall be the duty of the CATV committee to hold meetings as frequently as may be necessary, at least quarterly, in order to carry out the various functions of the committee as outlined in section 26-32."

394.    Under Defendant City Attorney Harkness' interpretation of the City of Albion Code, if the CATV committee failed to "hold meetings as frequently as may be necessary, at least quarterly," all of the CATV committee could be criminally prosecuted for such action or inaction.

395.    Such interpretation would lead to countless examples of absurd results.

396.    But in Plaintiff's case, Plaintiff was criminally prosecuted for allegations that Plaintiff violated Chapter 5 of the City of Albion Charter, which deals with City Council.

397.    The above-referenced interpretation of the City of Albion Charter, to interpret it to allow the criminal prosecution of any alleged violation of any Charter provision, is the starting point for the unconstitutionality of the City of Albion Charter as applied to Plaintiff, and Section 5.8 facially and as applied to Plaintiff.

398.    Further, Section 5.8 of the City of Albion Charter does not define the word "direct" and sweeps up far too much protected speech under the First Amendment.

**Defamation**

399.    Because Defendant Kipp alleged that Plaintiff committed defamation against Defendant Kipp, and because the Thrun Report did a shoddy factual and legal analysis of this issue, it is important to demonstrate precisely why Plaintiff did not commit defamation against Defendant Kipp and why all of Plaintiff's private Facebook Messenger messages were protected political speech.

400.    "The elements of a cause of action for **defamation** are: "(1) a false and defamatory statement concerning the plaintiff; (2) an unprivileged communication to a third party; (3) fault amounting to at least negligence on the part of the publisher; and (4) either actionability of the statement irrespective of special harm or the existence of special harm caused by the publication." *Rouch v. Enquirer & News of Battle Creek*, 440 Mich. 238, 251, 487 N.W.2d 205, 211 (1992) (citing *Locricchio v. Evening New Ass'n*, 438 Mich. 84, 115-16, 476 N.W.2d 112 (1991))."

401.    "A plaintiff must plead a defamation claim with specificity. *Royal Palace Homes, Inc. v. Channel 7 of Detroit*, 197 Mich. App. 48, 52, 495, N.W.2d. 392, 394 (Mich. Ct. App. 1992). The plaintiff cannot rely on general, conclusory allegations to support a defamation claim, but must specifically identify the statements alleged to be defamatory. *Id.* at 52-54, 57, 495 N.W.2d. at 394-95."

402.    "To prevail in a defamation claim, a plaintiff who is considered to be a "public official" or "public figure" must prove that the defendant acted with "actual malice" when publishing the alleged defamatory material. *New York Times v. Sullivan*, 376 U.S. 254, 279-280, 84 S. Ct. 710, 726 (1964).

403.    A defendant acts with "actual malice" when he acts "with knowledge that [the statement] was false or with reckless disregard of whether it was false . . ." *Id.* at 280, 710 S. Ct. at 726.

404.    In *Rosenblatt v. Baer*, the Supreme Court elaborated on who is a "public official" for purposes of the *New York Times* malice standard, providing: "It is clear . . . that the 'public official' designation applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial

responsibility for or control over the conduct of governmental affairs." *Rosenblatt v. Baer*, 383 U.S. 75, 85, 86 S. Ct. 669, 676 (1966).

405.     The Court further provided that the analysis of whether a plaintiff is a public official depends upon the following: Where a position in government has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees . . . the *New York Times* malice standard[] apply. *Id*. at 86, 86 S. Ct. at 676."

406.     There is no doubt that Defendant Scott Kipp, as the Chief of Public Safety for the City of Albion, is and was a public official for all relevant purposes of any defamation allegation against Plaintiff.

407.     Plaintiff did not act with malice in anything that Plaintiff said or did.

408.     Plaintiff did not say anything untruthful about Defendant Kipp.

409.     Plaintiff never made any public or private statement, which were then published, which were either false or with reckless disregard of the truthfulness of such statements.

410.     Even the Thrun Report correctly points out that no statements that Plaintiff ever made about Defendant Kipp amounted to defamation.

411.     And there is no defamation regarding this case.

412.     Further, ***substantial truth*** is an absolute defense to any defamation claim. *Collins v Detroit Free Press*, 245 Mich App 27; 627 NW2d 5 (2001); *Masson v New York Magazine,* 501 US 496 (1991).

413.     Further, ***opinion and fair comment privileges*** apply to defamation claims. *Gertz v Robert Welch, Inc*, 418 US 323 (1974).

414.    Further, in Michigan, only allegations of "crimes of moral turpitude" and "infamous crimes" can be the basis of a defamation claim. *Lakin v Rund*, 318 Mich App 127 (2016).

415.    For all of the above-listed reasons, Plaintiff **did not commit any defamation** against Defendant Kipp.

416.    Plaintiff also did not commit any defamation against Defendant Atchison.

**Criminal case against Plaintiff**

417.    Plaintiff was criminally prosecuted, without probable cause, for allegations, that Plaintiff violated Section 5.8 of the City of Albion Charter.

418.    Plaintiff had to retain legal counsel to fight the false allegations against her.

419.    The charges against Plaintiff, and the criminal trial against Plaintiff, were all very public, which led to humiliation, suffering, and reputational damage to Plaintiff, among other damages. (Media articles, **Exhibit 17**).

420.    Prior to trial, Plaintiff filed a motion to dismiss the case based upon the unconstitutional nature of the ordinance. (Motion, **Exhibit 18**).

421.    In Plaintiff's motion that is **Exhibit 18**, Plaintiff's legal counsel asserted that Plaintiff may not have standing to assert a Fourth Amendment violation; but this issue was never actually litigated and reduced to a valid judgment in the criminal case; and it accordingly has no collateral estoppel impact on this 42 USC § 1983 lawsuit. [*Donovan v Thames*, 105 F3d 219 (6th Cir 1997); *Sigley v Kuhn*, 205 F3d 1341 (6th Cir 2000); *Lichton v American Universal Ins Co*, 435 Mich 408 (1990).

422.    Plaintiff's trial took place on July 27, 2022.

423.    The jury deliberated for approximately 20 minutes before returning a unanimous verdict of not guilty for Plaintiff. (Court Sheet, **Exhibit 19**; Article, **Exhibit 20**).

### Count I: First Amendment Violation (Against All Defendants)

### (First Amendment; Article I. Section 5 of Michigan Const; 42 USC § 1983)

424.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 423 of this Complaint.

425.    The First Amendment to the United States Constitution protects Plaintiff's private Facebook Messenger messages that Plaintiff sent in November 2018.

426.    And Article I, Section 5 of the Michigan Constitution of 1963 protects Plaintiff's private Facebook Messenger messages that Plaintiff sent in November 2018.

427.    Defendants are "persons" under 42 USC § 1983.

428.    And Defendants are not entitled to qualified immunity. *Kisela v Hughs*, 548 US ___; 138 S Ct 1148 (2018). *Supra*.

429.    The Supreme Court has recognized that the First Amendment's protections extend to individual and collective speech "in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984).

430.    Accordingly, speech is generally protected under the First Amendment unless it falls within one of the narrow categories of unprotected speech. *Id*.

431.    In this case, for the reasons discussed above, Plaintiff was engaging in protected political speech.

432.    And Plaintiff's speech does not fall into any of the narrow categories of unprotected speech.

433.    Defendants unlawfully conspired to criminally prosecute Plaintiff, without probable cause, because Defendants did not like the content of Plaintiff's speech – as Plaintiff was speaking negatively about Defendant Kipp and the Albion Department of Public Safety.

434.    Plaintiff was speaking in her capacity as a private citizen, on Plaintiff's private time, from Plaintiff's private device, not in any capacity as a city council member, and was speaking on a matter of public concern, namely insubordination, disrespect, and corruption from Defendant Kipp.

435.    Defendant Kipp and Defendant Harkness unlawfully searched the cellular phone of LaTonya Rufus, without a warrant, and discovered the private Facebook Messenger Messages that Plaintiff wrote.

436.    Defendants conspired to initiate a recall petition against Plaintiff, which was unfortunately successful in November 2019.

437.    Defendant Kipp filed a baseless harassment and defamation complaint with the City of Albion.

438.    Defendants conspired to investigate Plaintiff for the baseless claims that Plaintiff harassed and defamed Defendant Kipp and that Plaintiff "directed" the removal of Defendant Kipp, in violation of an obscure section of the City of Albion Charter. See City of Albion Charter Section 5.8.

439.    Defendants conspired to hire a special prosecutor to criminally prosecute Plaintiff.

440.    Defendant Harkness actively participated in the prosecution of Plaintiff.

441.    An arrest warrant was issued against Plaintiff.

442.    And Plaintiff lost her liberty and freedom and was put on trial, which resulted in a swift and unanimous verdict of not guilty.

443.    In this case, Defendants intentionally, without legal authority, and under color of state law, violated Plaintiff's clearly established rights by illegally investigating and prosecuting Plaintiff for Plaintiff's protected speech.

444.    Defendants violated Plaintiff's clearly established rights in violation of 42 USC § 1983.

445.    As a direct and proximate result of Defendants' actions, Plaintiff has suffered, and continues to suffer, severe emotional distress, among other damages, in an amount to be proven at trial.

446.    Defendants acted with reckless, wanton, or callous indifference to Plaintiff's protected constitutional rights, which entitles Plaintiff to punitive damages in an amount appropriate to punish Defendants and to make an example of them to the community.

447.    Plaintiff is entitled to compensatory damages for Defendants' violation of Plaintiff's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

448.    Plaintiff is entitled to punitive damages for Defendants' reckless or callous indifference to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

449.    Plaintiff is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

450.    And Plaintiff is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

## Count II: First Amendment Retaliation (Against All Defendants)

## (First Amendment; 42 USC § 1983)

451.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 450 of this Complaint.

452.    For the reasons set forth above, Plaintiff was engaged in constitutionally protected activity through her words and conduct.

453.    It is well established that the First Amendment's protection of freedom of speech includes "both the right to speak freely and the right to refrain from speaking at all." *Wooley v. Maynard*, 430 U.S. 705, 714 (1977) (citing *W. Va. St. Bd. of Educ. v. Barnette*, 319 U.S. 624, 633–34 (1943)).

454.    As a necessary corollary to protect that fundamental right, the "right of free speech includes . . . the right to be free from retaliation by a public official for the exercise of that right." *Constantine v. Rectors & Visitors of George Mason Univ.*, 411 F.3d 474, 499 (4th Cir. 2005) (quoting *Suarez Corp. Indus. v. McGraw,* 202 F.3d 676, 685 (4th Cir. 2000)).

455.    To establish a claim for First Amendment retaliation, Plaintiff must put forth sufficient evidence that: (1) she engaged in protected First Amendment activity; (2) Defendants took some action that adversely affected Plaintiff's First Amendment rights; and (3) there was a causal relationship between her protected activity and Plaintiff's actions. *Id*.

456.    This case started with the unlawful and warrantless search of the cellular phone belonging to LaTonya Rufus.

457.    Defendant Kipp, at the direction of Defendant Harkness, unlawfully searched the applications on LaTonya Rufus' cellular phone, which contained the Facebook Messenger application.

458.    Plaintiff has a protected privacy interest in the private Facebook Messenger messages that Plaintiff sent to LaTonya Rufus and Garrett Brown, to which Defendant Kipp unlawfully accessed, copied, and the released to third parties.

459.    Plaintiffs assert that Defendant Kipp and Defendant Harkness acted without any proper cause or legal justification. *State v Hinton*; *Riley v California*; *Carpenter v United States*; *supra*.

460.    Plaintiff complained about the policy and practice and custom of the warrantless search of the cellular phone of LaTonya Rufus and the warrantless search of the private Facebook Messenger account.

461.    When Plaintiff complained about the policy and practice and custom of the warrantless search of the cellular phone of LaTonya Rufus and the warrantless search of the private Facebook Messenger account, Defendants retaliated against Plaintiff and violated Plaintiff's constitutional rights.

462.    In this case, Plaintiff was engaged in pure speech and political speech for her criticism of the government officials (Defendant Kipp and others) and when Plaintiff was challenging the warrantless search of the cellular phone of LaTonya Rufus and the warrantless search of the private Facebook Messenger account. *Supra*.

463.    Further, Defendants' decision to engage in a baseless investigation and to criminally prosecute Plaintiff was motivated primarily by Plaintiff's protected pure speech and political speech – in criticism of government officials and in challenging the

warrantless search of the cellular phone of LaTonya Rufus and the warrantless search of

the private Facebook Messenger account, which is constitutionally protected activity.

464.    In this case, Plaintiff was engaged in protected speech, Defendants engaged in a

political investigation and political prosecution against Plaintiff, which adversely affected

Plaintiff's ability to speak out and criticize public officials and challenge unlawful

government action such as unlawful searches.

465.    Further, there is a clear causal connection between Plaintiff's protected speech

and Defendants' unlawful investigation and criminal prosecution against Plaintiff.

466.    Accordingly, Defendants have engaged in First Amendment retaliation against

Plaintiff and are liable to Plaintiff.

467.    In engaging in First Amendment retaliation against Plaintiff, Defendants acted

with reckless, wanton, or callous indifference to Plaintiff's protected constitutional rights,

which entitles Plaintiff to punitive damages in an amount appropriate to punish

Defendants and to make an example of them to the community.

468.    Plaintiff is entitled to compensatory damages for Defendants' violation of

Plaintiff's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*,

565 US 118 (2012).

469.    Plaintiff is entitled to punitive damages for Defendants' reckless or callous

indifference to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

470.    Plaintiff is entitled to recover costs, including reasonable attorney fees, pursuant

to 42 USC § 1988.

471.    And Plaintiff is entitled to prospective injunctive and declaratory relief and a

permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

**Count III: *Monell* liability (Against All Defendants)**

**(First Amendment; Fourth Amendment; 42 USC § 1983)**

472.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 471 of this Complaint.

473.    A local government entity may not be sued under 42 USC § 1983 on a respondeat superior theory of liability.

474.    But a local government entity may be subject to §1983 liability for: (a) the existence of an illegal official policy or legislative enactment, (b) that an official with final decision making authority ratified illegal actions, (c) the existence of a policy of inadequate training or supervision, or (d) the existence of a custom of tolerance or acquiescence of federal rights violations. *Burgess v Fischer*, 735 F3d 462 (6th Cir 2013); *City of Canton v Harris*, 489 US 378; 109 S Ct 1197 (1989); *Monell v New York Dep't Soc Servs*, 436 US 658; 98 S Ct 2018 (1978).

475.    "Policy" refers to "official policy, a deliberate choice of a guiding principal or procedure made by the municipal official who has final authority regarding such matters. *Corwin v City of Independence Mo*, 829 F3d 695 (8th Cir 2016).

476.    For a policy that is unconstitutional on its face, a plaintiff needs no other evidence than a statement of the policy and its exercise. *Szabla v City of Brooklyn, Minn*, 486 F3d 85 (8th Cir 2007).

477.    In this case, the City of Albion Charter Section 5.8 is unconstitutional on its face and as applied to Plaintiff.

**Overbroad**

478.    "A law "is unconstitutionally overbroad when there exists `a realistic danger that

the statute itself will significantly compromise recognized First Amendment protections

of parties not before the court.'" *United Food & Commercial Workers Union, Local 1099*

*v. Southwest Ohio Regional Transit Auth*., 163 F.3d 341, 361 (6th Cir.1998) (quoting

*Leonardson v. City of East Lansing,* 896 F.2d 190, 195 (6th Cir.1990)); *see Deja Vu of*

*Nashville, Inc. v. Metro. Gov't of Nashville and Davidson County, Tenn*., 274 F.3d 377,

387 (6th Cir.2001) ("A law is overbroad under the First Amendment if it `reaches a

substantial number of impermissible applications' relative to the law's legitimate sweep.")

(quoting *New York v. Ferber,* 458 U.S. 747, 771, 102 S.Ct. 3348, 73 L.Ed.2d 1113

(1982)).

479.    The overbreadth doctrine exists "to prevent the chilling of future protected

expression." *Staley v. Jones,* 239 F.3d 769, 779 (6th Cir.2001). *See Bd. of Airport*

*Comm'rs v. Jews for Jesus, Inc*., 482 U.S. 569, 574, 107 S.Ct. 2568, 96 L.Ed.2d 500

(1987); *Brockett v. Spokane Arcades, Inc*., 472 U.S. 491, 503, 105 S.Ct. 2794, 86 L.Ed.2d

394 (1985).

480.    "Therefore, any law imposing restrictions so broad that it chills speech outside the

purview of its legitimate regulatory purpose will be struck down." *Deja Vu,* 274 F.3d at

387.

481.    The overbreadth doctrine is "strong medicine" that is used "sparingly and only as

a last resort." *Broadrick v. Oklahoma,* 413 U.S. 601, 613, 93 S.Ct. 2908, 37 L.Ed.2d 830

(1973).

482.    However, it is also "intentionally broad in scope." *Staley,* 239 F.3d at 779.

483.    "Facial challenges to overly broad statutes are allowed not primarily for the benefit of the litigant, but for the benefit of society — to prevent the statute from chilling the First Amendment rights of other parties not before the court." *Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 958, 104 S.Ct. 2839, 81 L.Ed.2d 786 (1984).

484.    Thus, "[i]n order for a statute to be found unconstitutional on its face on overbreadth grounds, `there must be a realistic danger that the statute itself will significantly compromise recognized First Amendment protections of parties not before the court.'" *Leonardson*, 896 F.2d at 195 (quoting *City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 801, 104 S.Ct. 2118, 80 L.Ed.2d 772 (1984)); *see Triplett Grille, Inc. v. City of Akron*, 40 F.3d 129, 135 (6th Cir.1994).

### Vague

485.    The void-for-vagueness doctrine finds its roots in the Due Process Clause, as well as the First Amendment.

486.    "Under the First Amendment, `speakers are protected from arbitrary and discriminatory enforcement of vague standards.'" *King Enterprises*, 215 F.Supp.2d at 917 (quoting *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 588, 118 S.Ct. 2168, 141 L.Ed.2d 500 (1998)).

487.    Due process requires that this Court hold a statute, ordinance, or resolution void for vagueness "if its prohibitive terms are not clearly defined such that a person of ordinary intelligence can readily identify the applicable standard for inclusion and exclusion." *United Food*, 163 F.3d at 358-59. *See Grayned v. City of Rockford*, 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972).

488.     Not only do "[v]ague laws ... trap the innocent by not providing fair warning," but laws that fail to provide explicit standards guiding their enforcement "impermissibly delegate[] basic policy matters to policemen, judges, and juries for resolution on an *ad hoc* and subjective basis, with the attendant dangers of arbitrary and discriminatory application." *Id*. at 108-09, 92 S.Ct. 2294; *Leonardson,* 896 F.2d at 196.

489.     "The absence of clear standards guiding the discretion of the public official vested with the authority to enforce the enactment invites abuse by enabling the official to administer the policy on the basis of impermissible factors." *United Food,* 163 F.3d at 359; *Leonardson,* 896 F.2d at 198.

490.     In the context of the First Amendment's protection of speech, the mischief that can be caused by vague statutes and rules is well-known:

491.     Quite simply, "the danger of censorship and of abridgment of our precious First Amendment freedoms is too great where officials have unbridled discretion over a forum's use." *Southeastern Promotions, Ltd*. *v*. *Conrad,* 420 U.S. 546, 553, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975).

492.     We will not presume that the public official responsible for administering a legislative policy will act in good faith and respect a speaker's First Amendment rights; rather, the vagueness "doctrine requires that the limits the [government] claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well- established practice." *City of Lakewood v*. *Plain Dealer Publ'g Co*., 486 U.S. 750, 770, 108 S.Ct. 2138, 100 L.Ed.2d 771 (1988).

493.     Section 5.8 of the City of Albion Charter must be evaluated to determine whether they can be read to prohibit protected speech, and whether they contain sufficient

standards to allow application and enforcement in a uniform, nonarbitrary manner without leaving undue discretion in the enforcing official to decide if certain speech violates their provisions." [from *Smith ex rel. Smith v. Mount Pleasant Public Sch.*, 285 F.Supp.2d 987 (E.D. Mich. 2003)].

494.    Plaintiff adopt the legal reasoning and rationale, in full, of the *Smith ex rel Smith v Mt Pleasant Public Schools* case.

495.    In this case, Section 5.8 of the City of Albion Charter does not make clear that any violation would render one subject to criminal prosecution.

496.    There is no penalty provision to Chapter 5 of the City of Albion Charter.

497.    Criminal ordinances that comprise the City of Albion Code of Ordinances, which is part of the Charter, are in Chapter 58 entitled "Offenses and Miscellaneous Provisions."

498.    The community would have fair warning that a violation of Chapter 58 would lead to criminal sanctions.

499.    But not Chapter 5 of the City of Albion Charter, which addresses regulations for City Council.

500.    Under Defendants' version and interpretation of the City of Albion Charter, the entire City of Albion council would be subject to criminal prosecution and up to 90 days in jail if the entire City Council did not meet in the established council chambers and hold at least 2 regular meetings in each month. See Section 5.6(a).

501.    Would city council's failure to hold 2 regular meetings each month be a strict liability offense?

502.    Would there be a mens rea requirement to establish a violation of Section 5.6(a)?

503.    Is there a willfulness or intentional conduct element in order to violate Section 5.6(a)?

504.    All of these outstanding questions lead to the conclusion that Section 5.8 and Section 5.6 cannot be construed to confer criminal sanctions for any such violation of these sections of the Charter.

505.    Such interpretation reaches a substantial number of impermissible applications relative to the law's legislative sweep. *New York v Ferber*, 458 US 747 (1982).

506.    Further, the word "direct" is not defined in Section 5.8.

507.    It is unknown whether "direct" refers to actions or whether the word "direct" can reference words alone.

508.    Plaintiff asserts that "direct" is an action and not simply words.

509.    One simply does not know the answer to this question, and the 10th District Court's struggle to draft a jury instruction for Plaintiff's jury trial shows the constitutional issues with the language of Section 5.8.

510.    Further, Section 5.8 has arbitrary and discriminatory enforcement.

511.    To Plaintiff's knowledge, Section 5.8 has never been used to criminally prosecute anyone in the entire history of the ordinance, which was enacted in 1998, upon information and belief.

512.    Plaintiff asserts that Section 5.8 will never be used to criminally prosecute anyone ever again.

513.    In this case, Defendants weaponized Section 5.8 of the City of Albion Charter, an unconstitutional policy, to investigate Defendants' political enemy (Plaintiff) and to politically prosecute Plaintiff.

514.    That is the type of arbitrary and discriminatory enforcement that renders Section 5.8 unconstitutional.

515.    Further, Section 5.8 invites abuse by enabling the officials to administer the policy on the basis of impermissible factors. *Smith ex rel Smith*; *supra*.

516.    And Plaintiff's case is the quintessential example of abusing such an ordinance, as Plaintiff was investigated and politically prosecuted by Plaintiff's political enemies.

517.    Accordingly, Defendants are liable under *Monell* and its progeny.

518.    Further, Defendants are final policy makers whose decisions are not subject to review by another official or governmental body. *McMillian v Monroe County*, 520 US 781 (1997).

519.    Defendants enacted the unconstitutional policy of Section 5.8 and the punishment provision of the City of Albion Charter.

520.    The unconstitutional policies violated Plaintiff's constitutional rights.

521.    Accordingly, Defendants are liable under *Monell* and its progeny.

522.    Further, §1983 claims for failure to train employees requires proof that: (a) the training practices were inadequate, (b) the local government entity was deliberately indifferent to the rights of others in adopting them, such that the 'failure to train reflects a deliberate or conscious choice by the local government entity, and (c) the alleged deficiency in the training procedures actually caused the plaintiff's injury. *City of Canton*; *Id*.

523.    Plaintiffs must also prove that "the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights,

that the policymakers of the [local government entity] can reasonably be said to have been deliberately indifferent to the need." *Id.*

524.    In this case, Defendants violated Plaintiff's First Amendment rights and Fourth Amendment rights – by unconstitutionally infringing upon Plaintiff's ability to criticize government officials and to complain about unconstitutional search and seizures – and by unlawfully engaging in a warrantless search of the cellular phone of LaTonya Rufus, whereby Defendant Kipp and Defendant Harkness accessed the private Facebook Messenger account to which Plaintiff had a protected privacy interest in such account.

525.    There was an obvious need to train employees on First Amendment law and Fourth Amendment law, particularly in light of the *Rilvey v California* and *Carpenter v United States* cases.

526.    The inadequacy of the training by Defendants was so likely to result in the violation of constitutional rights, which is precisely what happened to Plaintiff in this case.

527.    Further, the customs and practices of the unlawful search that occurred in this case, amount to policy for Defendants.

528.    Plaintiff asserts that the Defendants, who ratified the customs and practices of the unlawful phone search, had actual or constructive knowledge of the unlawful search customs and practices. *Deaton v Montgomery County*, 989 F2d 885 (6th Cir 1993).

529.    Accordingly, Defendants are liable under *Monell* and its progeny.

530.    In engaging in *Monell* liability against Plaintiff, Defendants acted with reckless, wanton, or callous indifference to Plaintiff's protected constitutional rights, which entitles

Plaintiff to punitive damages in an amount appropriate to punish Defendants and to make an example of them to the community.

531.    Plaintiff is entitled to compensatory damages for Defendants' violation of Plaintiff's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

532.    Plaintiff is entitled to punitive damages for Defendants' reckless or callous indifference to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

533.    Plaintiff is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

534.    And Plaintiff is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

**Count IV: Malicious Prosecution (Against Defendants City of Albion, Smith, Reid, Williamson, Atchison, Kipp, Kern, Harkness, and Wygant)**

**(Fourth Amendment; 42 USC § 1983)**

535.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 534 of this Complaint.

536.    The Fourth Amendment guarantees the right to be free from unjust prosecution. *Jackson v City of Cleveland*, 925 F3d 793 (6th Cir 2019).

537.    The tort of malicious prosecution remedies injuries associated not with the absence of legal process but with the wrongful institution of legal process.

538.    A valid claim for malicious prosecution requires a plaintiff to allege facts showing: "(1) a criminal prosecution was initiated against the plaintiff and the defendant made, influenced, or participated in the decision to prosecute; (2) there was no probable

cause for the criminal prosecution; (3) as a consequence of the legal proceeding, the plaintiff suffered a deprivation of liberty apart from the initial seizure; and (4) the criminal proceeding was resolved in the plaintiff's favor." *Robertson v. Lucas*, 753 F.3d 606, 616 (6th Cir. 2014).

539.    The Sixth Circuit has noted that, while malice is not required, a defendant's participation in the prosecution must be "deliberate–i.e., given with knowledge of, or reckless disregard for, its falsity.

540.    'Allegations of negligence or innocent mistake are insufficient.'" *Johnson v. Moseley*, 790 F.3d 649, 655 (6th Cir. 2015) (citations omitted).

541.    "A 'reckless disregard for the truth' is demonstrated by showing that the officers . . . had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp v. City of Noblesville, Ind.*, 320 F.3d 733, 743 (7th Cir. 2003).

542.    "Providing reports, affidavits, or other investigative materials containing falsehoods, omissions, or misstatements to a prosecutor can constitute participation when (1) those materials formed the basis of the charge, and (2) the falsehoods, omissions, or misstatements were made deliberately or with reckless disregard for the truth." *Meeks v City of Detroit*, 727 F App'x 171 (6th Cir 2018).

543.    In this case, it is undisputed that the named defendants initiated a criminal prosecution was initiated against Plaintiff.

544.    Defendants Smith, Reid, Williamson, and Atchison all voted to hire a special prosecutor in order to criminally prosecute Plaintiff.

545.    Defendants Kipp and Kern participated and acquiesced in the unlawful search of
the cellular phone of LaTonya Rufus, which revealed the private Facebook Messenger
messages that formulated the allegations that Plaintiff violated Section 5.8 of the City of
Albion Charter.

546.    Then Defendants Kipp and Kern conspired with Defendants Smith, Reid,
Williamson, and Atchison to push for an investigation and prosecution of Plaintiff.

547.    Defendant Harkness directed Defendant Kipp to unlawfully search the cellular
phone of LaTonya Rufus.

548.    Defendant Harkness then conspired with Defendants Kipp and Kern and Smith,
and Reid, and Williamson, and Atchison to investigate and criminally prosecute Plaintiff.

549.    Defendant Harkness then actively initiated the criminal complaint and police
report against Plaintiff with Defendant Wygant.

550.    Defendant Wygant then swore to and procured an arrest warrant against Plaintiff.

551.    The investigative materials provided to the examining magistrate for this case,
which was the two page police report (and potentially attached Thrun Report), contained
material omissions: namely the full set of text messages between Plaintiff and Garrett
Brown and LaTonya Rufus, which showed the insubordination and disrespect from
Defendant Kipp toward LaTonya Rufus, thus providing background and context to the
written statement from Plaintiff, "Get rid of him!"

552.    The investigative materials provided to the examining magistrate for this case,
which was the two page police report (and potentially attached Thrun Report), contained
additional material omissions: the public statements and public responses and public

comments made by Plaintiff (except the Attachment 3) giving her explanation and intent and background and context of the situation.

553.    The investigative materials provided to the examining magistrate for this case, which was the two page police report (and potentially attached Thrun Report), contained additional material omissions: the fact that the "Get rid of him!" written statement was made at a private residence, from a private device, during non-work hours, in Plaintiff's capacity as a private citizen, and on a matter of public concern, which was protected political speech (no mention of the First Amendment in the Thrun Report).

554.    The investigative materials provided to the examining magistrate for this case, which was the two page police report (and potentially attached Thrun Report), contained additional material omissions: that the private Facebook Messenger messages, including the "Get rid of him!" message, were retrieved through an unlawful and warrantless search of the cellular telephone of LaTonya Rufus.

555.    Next, there was no probable cause for the criminal prosecution against Plaintiff.

556.    "[P]rotected speech cannot serve as the basis" for probable cause. *Leonard v. Robinson*, 477 F.3d 347, 358 (6th Cir. 2007) (citing *Sandul v. Larion*, 119 F.3d 1250, 1256 (6th Cir. 1997)) [an officer may not base his or her probable cause determination on speech protected by the First Amendment].

557.    While protected speech can be evidence that a speaker committed a separate crime, the First Amendment bars its use as the sole basis for probable cause. See *Reichle*, 566 U.S. at 668; see also *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722, 1724 (2019); *Novak v City of Parma*, 932 F.3d at 431–32.

558.     And if the freedom of speech secured by the First Amendment includes the right

to curse at a public official, then it surely includes the right to say "[get] rid of" a public

official. *Chaplinsky v. New Hampshire*, 315 U.S. 568, 569 (1942) ("'You are a God

damned racketeer' and 'a damned Fascist'"); *Sandul v. Larion*, 119 F.3d 1250, 1255 (6th

Cir. 1997) ("In 1990 when [the defendant] was arrested for his use of the 'f - word,' it

was clearly established that speech is entitled to First Amendment protection."); *Buffkins

v. City of Omaha*, 922 F.2d 465, 467 (8th Cir. 1990) ("I will have a nice day, asshole.")

559.     Further, Section 5.8 of the City of Albion Charter is an unconstitutional

ordinance, both facially and as applied to Plaintiff.

560.     There can be no probable cause to prosecute based upon an unconstitutional

ordinance.

561.     Further, Plaintiff was deprived of liberty beyond the initial seizure for this case.

562.     Plaintiff had to participate in pretrial release and suffered a loss of liberty and

restriction of movement while awaiting trial. *Miller v Maddox*, 866 F3d 386 (6th Cir

2017).

563.     Finally, the criminal proceeding was resolved in Plaintiff's favor, with the swift

and decisive not guilty verdict after approximately 20 minutes of deliberation.

564.     In engaging in malicious prosecution against Plaintiff, Defendants acted with

reckless, wanton, or callous indifference to Plaintiff's protected constitutional rights,

which entitles Plaintiff to punitive damages in an amount appropriate to punish

Defendants and to make an example of them to the community.

565.    Plaintiff is entitled to compensatory damages for Defendants' violation of

Plaintiff's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*,

565 US 118 (2012).

566.    Plaintiff is entitled to punitive damages for Defendants' reckless or callous

indifference to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

567.    Plaintiff is entitled to recover costs, including reasonable attorney fees, pursuant

to 42 USC § 1988.

568.    And Plaintiff is entitled to prospective injunctive and declaratory relief and a

permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

### Count V: Conspiracy to Interfere with Civil Rights (Against All Defendants)

### (42 USC § 1985)

569.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 568 of this

Complaint.

570.    42 USC § 1985 provides, in pertinent part:

### (3) Depriving persons of rights or privileges

If two or more persons in any State or Territory conspire or go in disguise on the highway

or on the premises of another, for the purpose of depriving, either directly or indirectly,

any person or class of persons of the equal protection of the laws, or of equal privileges

and immunities under the laws; or for the purpose of preventing or hindering the

constituted authorities of any State or Territory from giving or securing to all persons

within such State or Territory the equal protection of the laws; or if two or more persons

conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled

to vote, from giving his support or advocacy in a legal manner, toward or in favor of the

election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; in any case of conspiracy set forth in this section, if one or more persons engaged therein do, or cause to be done, any act in furtherance of the object of such conspiracy, whereby another is injured in his person or property, or deprived of having and exercising any right or privilege of a citizen of the United States, the party so injured or deprived may have an action for the recovery of damages occasioned by such injury or deprivation, against any one or more of the conspirators.

571.    The standard for proving a civil conspiracy was set forth by the Sixth Circuit in *Hooks v. Hooks*, 771 F.2d 935, 943-44 (6th Cir. 1985):

572.    A civil conspiracy is an agreement between two or more persons to injure another by unlawful action.

573.    Express agreement among all the conspirators is not necessary to find the existence of a civil conspiracy.

574.    Each conspirator need not have known all of the details of the illegal plan or all of the participants involved.

575.    All that must be shown is that there was a single plan, that the alleged coconspirator shared in the general conspiratorial objective, and that an overt act was committed in furtherance of the conspiracy that caused injury to the complainant. *Id*.; see also *Gillispie*, 2020 WL 5629677, at *40.

576.    "[T]o be successful in claiming a conspiracy to violate the plaintiff's constitutional rights, the plaintiff "must show that (1) a single plan existed, (2) the

conspirators shared a conspiratorial objective to deprive the plaintiff[ ] of [his or her] constitutional rights [or federal statutory rights], and (3) an overt act was committed in furtherance of the conspiracy that caused the injury" to the plaintiff." *Gillispie*, 2020 WL 5629677, at *40 (citing *Jackson v. City of Cleveland*, 925 F.3d 793, 817 (6th Cir. 2019), cert. denied, —— U.S. ——, 140 S. Ct. 855 (Jan. 13, 2020) (internal quotation marks omitted); *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011)); see also *Marvaso v. Sanchez*, 971 F.3d 599, 606 (6th Cir. 2020) (describing the elements of a §1983 conspiracy claim); *Weser*, 965 F.3d at 516 (same).

577.    In this case, as demonstrated above, all named defendants had a single plan: to oust Plaintiff from city council and to make sure that Plaintiff stayed away from city council by criminally prosecuting Plaintiff and tarnishing Plaintiff's reputation in the community.

578.    All named defendants shared the objective of this single plan.

579.    All named defendants committed an overt act in furtherance of this conspiracy: Kipp by conducting the unlawful search, Harkness by directing the unlawful search, Kipp by filing the harassment and defamation complaint, Defendant Nelson for initiating the recall petition with Defendant Smith, the city council defendants by initiating a political investigation against Plaintiff and by voting to hire an investigator to investigate the bogus claims and by voting to hire a special prosecutor to prosecute Plaintiff, Defendant Harkness for initiating the formal police report against Plaintiff, Defendant Wygant for initiating the criminal complaint and obtaining the arrest warrant to criminally prosecute Plaintiff.

580.    In engaging in a conspiracy against Plaintiff, Defendants acted with reckless, wanton, or callous indifference to Plaintiff's protected constitutional rights, which entitles Plaintiff to punitive damages in an amount appropriate to punish Defendants and to make an example of them to the community.

581.    Plaintiff is entitled to compensatory damages for Defendants' violation of Plaintiff's constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565 US 118 (2012).

582.    Plaintiff is entitled to punitive damages for Defendants' reckless or callous indifference to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

583.    Plaintiff is entitled to recover costs, including reasonable attorney fees, pursuant to 42 USC § 1988.

584.    And Plaintiff is entitled to prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

### Count VII: Policy is Unconstitutional (Against All Defendants)

585.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 584 of this Complaint.

586.    For the reasons stated above, sections of Defendants' Section 5.8 of the City of Albion Charter is unconstitutional on their face and as applied to EB.

587.    Plaintiffs seek an order declaring Section 5.8 of the City of Albion Charter to be unconstitutional.

588.    Plaintiffs further seek an injunction preventing Defendants from enforcing Section 5.8 of the City of Albion Charter as a criminal offense.

**Count VIII: Policy and Custom is Unconstitutional in Violation of Fourth**

**Amendment (Against All Defendants)**

589.    Plaintiff re-alleges and incorporates by reference paragraphs 1 through 588 of this

Complaint.

590.    For the reasons stated above, the policy and custom of searching cellular phones

of employees without a search warrant is unconstitutional and in violation of the Fourth

Amendment and the Michigan Constitution.

591.    Plaintiffs seek an order declaring the policy and custom of searching cellular

phones of employees without a search warrant to be unconstitutional.

592.    Plaintiffs further seek an injunction preventing Defendants from further  searching

cellular phones of employees without a search warrant.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests the Honorable Court to:

A.  Grant Plaintiff damages in the amount of **5 million dollars**, as described above
    and below

B.  Grant Plaintiff compensatory damages for Defendants' violation of Plaintiff's
    constitutional rights. *Carey v Piphus*, 435 US 247 (1978); *Minneci v Pollard*, 565
    US 118 (2012).

C.  Grant Plaintiff punitive damages for Defendants' reckless or callous indifference
    to Plaintiff's federally protected rights. *Smith v Wade*, 461 US 30 (1983).

D.  Grant Plaintiff costs, including reasonable attorney fees, pursuant to 42 USC §
    1988 and any other state or federal law.

E.  Declare and making a finding that Defendants acted outside the scope of their authority in prosecuting Plaintiff, in violation of Plaintiff's First Amendment rights.

F.  Declare and make a finding that Defendants engaged in First Amendment retaliation against Plaintiff.

G.  Declare and make a finding that Defendants are responsible for *Monell* liability, as stated above.

H.  Grant Plaintiff prospective injunctive and declaratory relief and a permanent injunction prohibiting further violations of Plaintiff's First Amendment rights.

I.  Compel Defendants to make changes to their policies, practices, customs, and procedures by stopping the unlawful First Amendment violations and retaliating against private citizens who engage in constitutionally protected political speech. Implementing such changes will not impose undue fiscal and administrative burdens upon Defendants. *Matthews v Eldridge*, 424 US 319 (1976).

J.  Issue an order declaring that Section 5.8 of the City of Albion Charter to be unconstitutional, facially and as applied to Plaintiff

K.  Grant an injunction preventing Defendants from enforcing Section 5.8 of the City of Albion Charter to criminally prosecute any individual

L.  Issue an order declaring the warrantless search of an employee's cellular phone policy and custom to be unconstitutional

M.  Grant an injunction preventing Defendants from implementing the unconstitutional warrantless search of employees' phones policy and custom, and

N.  Grant any other relief as just and equitable.

Dated: December 30, 2022                    /s/ Eric J. Sheppard
_____
By: Eric J. Sheppard, P71914
Attorney for Plaintiff
2109 Hamilton Road, Suite 206
Okemos MI 48864
Ph: 517-618-1580
Fx: 517-913-6321
ericsheppard16@gmail.com

**I DECLARE UNDER THE PENALTIES OF PERJURY THAT THE COMPLAINT HAS BEEN EXAMINED BY ME AND THAT ITS CONTENTS ARE TRUE TO THE BEST OF MY INFORMATION, KNOWLEDGE, AND BELIEF.**

Dated: December 30, 2022                    /s/ Sonya Brown
_____
By: Sonya Brown

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury.

Dated: December 30, 2022                    /s/ Eric J. Sheppard
_____
By: Eric J. Sheppard, P71914
Attorney for Plaintiff
2109 Hamilton Road, Suite 206
Okemos MI 48864
Ph: 517-618-1580
Fx: 517-913-6321
ericsheppard16@gmail.com